# EXHIBIT A

PIRO, ZINNA, CIFELLI PARIS & GENITEMPO
LIMITED LIABILITY COMPANY
Kathryn Kyle Forman, Esq. (905392012)
360 Passaic Avenue
Nutley, NJ 07110
Phone: (973) 661-0710
Fax: (973) 661-5157
Attorneys for Plaintiff, Eduardo Gordon

| | |
|---|---|
| EDUARDO GORDON :<br><br>            Plaintiff, :<br><br>vs. :<br><br>NICE SYSTEMS, INC., NICE :<br>SYTEMS LATIN AMERICA, INC., :<br>JOHN DOES 1-10, ABC CORPS. :<br>1-10, RICHARD ROES 1-10 and :<br>DEF CORPS. 1-10(fictitious :<br>names representing one or more:<br>unknown defendants), :<br><br>            Defendant(s). :<br> : | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: BERGEN COUNTY<br>DOCKET NO.: -<br><br><br>    CIVIL ACTION<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff, **EDUARDO GORDON**, residing at Julian Alvarez 1364, (1414) CABA, Argentina, by way of Complaint herein states:

## ALLEGATIONS RELEVANT TO ALL COUNTS

1.   At all times relevant hereto, Plaintiff Eduardo Gordon ("Plaintiff") was and is a resident of Buenos Aires, Argentina.

2.     At all times relevant hereto, Defendants NICE SYSTEMS, INC. and NICE SYSTEMS LATIN AMERICA, INC. (collectively "NICE Systems") were and are an enterprise software solutions company, operating and doing business at 301 Route 17, Rutherford, New Jersey.

3.     On or about November 16, 2009, Plaintiff entered into a Consulting Agreement with NICE Systems, a copy of which is annexed hereto as Exhibit A. Plaintiff was paid on the basis of a Sales Incentive Plan and Goal Sheet. A copy of the Sales Incentive Plan is annexed hereto as Exhibit B, and a copy of the Goal Sheet is annexed hereto as Exhibit C.

4.     Plaintiff was engaged as a Sales Manager for Latin America and was responsible for sales. In addition to commissions for sales, Plaintiff also earned commissions on services including installation, maintenance, and training relating to his product lines for NICE Systems. Plaintiff's compensation was based upon several product lines including NiceVision (NV), Public Safety (PS), and Situation Management (SMS).

5.     During his relationship with NICE Systems, Plaintiff facilitated a transaction entitled the Secure City Project for Tegucigalpa, Honduras (the "Hercules Project"), in which the Honduran Government engaged NICE Systems as a subcontractor. As a result, NICE Systems was to receive approximately $25 million in or about 2011. The NV, PS, and SMS product lines were the only

product lines involved in the sale. Upon information and belief, the contract for the Hercules Project also included services and maintenance for these products.

6.    In connection with the Hercules Project, Plaintiff, among other things, attended several meetings in Honduras with the Sales Team, the Minister of Honduras, the local business partner, the integrator of the project, banks, tax advisors, local installers, and others. Plaintiff further provided a summary report with his observations and recommendations following the first meeting, created an Executive Summary for the project. Plaintiff also translated the contract for the Hercules Project into Spanish, checked compliance with local laws for the terms of the contract and made recommendations for modifications to NICE Systems' attorney. As an Electronic Engineer with a degree from Buenos Aires University, Plaintiff also reviewed and corrected technical mistakes in the Contract and suggested modifications and revisions. Furthermore, Plaintiff used his own contacts at HSBC in Honduras to make introductions to obtain financing for the project.

7.    Plaintiff played a substantial and crucial role in the facilitation of the Hercules Project and was recognized in emails from Defendants recognizing him for his hard work and contribution.

8.    Upon information and belief, NICE Systems was paid approximately $25 million in connection with the Hercules Project.

9.   However, when commissions were calculated for 2011, the year that the Hercules Project was consummated, Plaintiff was only paid approximately $37,000, far less than what would be due to him on a $25 million sale primarily involving the NV/PS/SMS product lines.

10.   At the end of 2011, Plaintiff's consultant services were terminated by Defendant NICE Systems.

11.   Plaintiff made ongoing complaints to NICE Systems that his compensation for the Hercules Project was not measured accurately in accordance with the Sales Incentive Plan and Goal Sheet. NICE Systems responded that Plaintiff was paid his commissions at a discounted rate because only 9.09% of the project consisted of the NV/PS/SMS product lines for which he was responsible. NICE Systems has provided no basis for reaching the conclusion that only 9.09% of the Hercules project consisted of the NV/PS/SMS product lines. There were no other product lines nor services that were included in the Hercules Project other than the ones related to NV/PS/SMS.

12.   In or around 2013, NICE Systems informed Plaintiff that it believed it had made a mistake and recalculated the commission, paying Plaintiff an additional $37,000.

13.   NICE Systems later alleged that the remainder of the project was designated as another product line referred to as "S2", but S2 is not defined in any document and the Billing Chart for

the project does not correlate line items on the chart with any tangible product or services.

14. The entire Hercules project was billed as product only, despite the fact that the contract included services and maintenance for which Plaintiff would have been entitled to commissions, and the only products sold were PS, NV, and SMS. The installation, maintenance, service, margins and profits on these products were all commissioned in accordance with Plaintiff's Goal Sheet (See Exhibit C).

15. Therefore, Plaintiff's commission should have been calculated as though the PS, NV, and SMS products were the only components of the Hercules Project, using the Quotas and Multipliers set forth in the 2011 Goal Sheet that he was provided during his tenure with NICE Systems.

16. Upon information and belief, the total amount of the Hercules Project upon which Mr. Gordon's commission was to be calculated totaled twenty four million, nine hundred twenty four thousand, three hundred fifty dollars ($24,924,350.00), which, upon information and belief, is the amount that NICE was to be paid for the Hercules Project. Therefore, Plaintiff is entitled to a total commission of nine hundred thirty seven thousand, two hundred sixty four dollars, and eighty two cents ($937,264.82), providing a credit to NICE Systems of $74,000.00 for payments already made by NICE Systems to Plaintiff. Thus, Mr. Gordon is

entitled to outstanding commissions from NICE Systems of approximately eight hundred sixty three thousand, two hundred sixty four dollars and eighty two cents ($863,264.82).

17.  Additionally, Plaintiff is owed unpaid bonuses unrelated to the Hercules Project, in the amount of approximately $80,000.00.

### COUNT ONE

### BREACH OF CONTRACT

18.  Plaintiff repeats and re-alleges each of the statements set forth in the preceding paragraphs as if same were set forth at length herein.

19.  As set forth in the Consultant Agreement, the Plaintiff has fully performed his obligations to NICE Systems pursuant to his Consulting Agreement, Sales Incentive Plan, and Goal Sheet ("Agreements").

20.  Defendants NICE Systems' failure to make payment under the terms of the Agreements constitutes a material breach of the terms and conditions of the Agreements.

21.  As a direct and proximate result of the aforementioned conduct, Plaintiff has suffered and will continue to suffer economic loss.

**WHEREFORE**, the Plaintiff demands judgment against the Defendants, jointly and severally, for the following:

1) An accounting of all sums due and owing to the Plaintiff;

2)  compensatory damages;

3)  special damages;

4)  pre-judgment interest;

5)  counsel fees;

6)  costs of suit; and any other relief that the court deems to be just and equitable.

## COUNT TWO

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

22.  Plaintiff repeats and re-alleges each of the statements set forth in the preceding paragraphs as if same were set forth at length herein.

23.  The parties agreed that Plaintiff would be compensated based on the performance of the PS, NV, and SMS Product Lines.

24.  Upon information and belief, the Hercules Project resulted in NICE Systems receiving payment in the approximate amount of $25 million, all of which was attributable to the performance of the PS, NV, and SMS Product Lines and thus was the basis for the calculation of the Plaintiff's commissions.

25.  NICE Systems misrepresented to the Plaintiff that the success of the Hercules Produce was not 100% attributable to the performance of the PS, NV, and SMS Product Lines and compensated him at an arbitrary, discounted rate.

26.   NICE Systems acted in bad faith to deprive Plaintiff of the benefit of the bargain between the parties.

27.   As a direct and proximate result of the aforementioned conduct, Plaintiff has suffered and will continue to suffer economic loss.

**WHEREFORE**, the Plaintiff demands judgment against the Defendants, jointly and severally, for the following:

> 1) An accounting of all sums due and owing to the Plaintiff;
>
> 2)   compensatory damages;
>
> 3)   special damages;
>
> 4)   pre-judgment interest;
>
> 5)   counsel fees;
>
> 6)   costs of suit; and any other relief that the court deems to be just and equitable.

## COUNT THREE

### CONVERSION

28.   Plaintiff repeats and re-alleges each of the statements set forth in the preceding paragraphs as if same were set forth at length herein.

29.   The Plaintiff is lawfully entitled to the commissions and bonuses that he earned during his performance of work for NICE Systems.

30. In refusing to pay the Plaintiff for the work he performed, NICE Systems converted and deprived the Plaintiff of assets to which he was lawfully entitled.

31. As a direct and proximate result of the aforementioned conduct, Plaintiff has suffered and will continue to suffer economic loss.

**WHEREFORE**, the Plaintiff demands judgment against the Defendants, jointly and severally, for the following:

1) An accounting of all sums due and owing to the Plaintiff;

2) compensatory damages;

3) punitive damages;

4) special damages;

5) pre-judgment interest;

6) counsel fees;

6) costs of suit; and any other relief that the court deems to be just and equitable.

### COUNT FOUR

### UNJUST ENRICHMENT/QUANTUM MERUIT

32. Plaintiff repeats and re-alleges each of the statements set forth in the preceding paragraphs as if same were set forth at length herein.

33.  In  performing  work  for  NICE  Systems  including facilitating  the  Hercules  Project,  the  Plaintiff  conferred  a benefit on NICE Systems.

34.  The  Plaintiff  conferred  this  benefit  on  NICE  Systems with  the  reasonable  expectation  that  he  would  be  compensated  in accordance  with  the  Sales  Incentive  Plan  and  Goal  Sheet,  and  that he  would  be  paid  any  bonuses  he  earned  in  accordance  with  NICE Systems' compensation policies.

35.  The  Plaintiff  conferred  this  benefit  under  circumstances that  should  have  put  NICE  Systems  on  notice  that  the  Plaintiff expected to be paid his earned compensation.

36.  In failing to pay the Plaintiff his earned compensation, NICE Systems has unjustly enriched itself.

37.  As  a  direct  and  proximate  result  of  the  aforementioned conduct,  Plaintiff  has  suffered  and  will  continue  to  suffer economic loss.

**WHEREFORE**,  the  Plaintiff  demands  judgment  against  the Defendants, jointly and severally, for the following:

1) An  accounting  of  all  sums  due  and  owing  to  the Plaintiff;

2) compensatory damages;

3) punitive damages;

4) special damages;

5) pre-judgment interest;

6)   counsel fees;

6)   costs of suit; and any other relief that the court deems to be just and equitable.

### JURY DEMAND

Plaintiff hereby demands trial by jury as to all matters herein.

### TRIAL DESIGNATION

Pursuant to R.4:5-1, Kathryn Kyle Forman, Esq., is hereby designated as trial counsel for the within matter.

### CERTIFICATION

I certify, pursuant to R. 4:5-1, that the matter in controversy is not the subject of any other action or arbitration proceeding, now or contemplated, and that no other parties should be joined in this action at this time.

**PIRO, ZINNA, CIFELLI,**
**PARIS & GENITEMPO, LLC**
Attorneys for Plaintiff

BY: _____
        Kathryn Kyle Forman, Esq.

Dated: December 28, 2017

## CERTIFICATION OF COMPLIANCE

Pursuant to Rule 1:38-7(c) and Rule 4:5-1, I hereby certify that all personal information has been redacted from this pleading in the above referenced matter as no personal information was provided.

I further certify that confidential personal identifiers have been redacted from documents now submitted to the Court, and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).

PIRO, ZINNA, CIFELLI, PARIS & GENITEMPO
Attorneys for Plaintiff

By: _____
KATHRYN KYLE FORMAN, ESQ.

Dated: December 28, 2017.

# Civil Case Information Statement

**Case Details: BERGEN | Civil Part Docket# L-009162-17**

**Case Caption:** GORDON EDUARDO  VS NICE SYSTEMS, INC.

**Case Initiation Date:** 12/28/2017

**Attorney Name:** KATHRYN KYLE FORMAN

**Firm Name:** PIRO ZINNA CIFELLI, ET AL

**Address:** 360 PASSAIC AVE

NUTLEY NJ 071102787

**Phone:**

**Name of Party:** PLAINTIFF : Gordon, Eduardo

**Name of Defendant's Primary Insurance Company**
(if known): Unknown

**Case Type:** EMPLOYMENT (OTHER THAN CEPA OR LAD)

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 6 JURORS

**Hurricane Sandy related?** NO

**Is this a professional malpractice case?**  NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE**

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** NO

**If yes, is that relationship:**

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO

**If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO

**If yes, for what language:**

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

12/28/2017
Dated

/s/ KATHRYN KYLE FORMAN
Signed

**PIRO, ZINNA, CIFELLI PARIS & GENITEMPO, LLC**
Kathryn Kyle Forman, Esq. (905392012)
360 Passaic Avenue
Nutley, NJ 07110
Phone: (973) 661-0710
Fax: (973) 661-5157
Attorneys for Plaintiff, Eduardo Gordon

| | | |
|---|---|---|
| EDUARDO GORDON | : | SUPERIOR COURT OF NEW JERSEY |
| | : | LAW DIVISION: BERGEN COUNTY |
| | : | DOCKET NO.: BER-L-9162-17 |
| Plaintiff, | : | |
| | : | |
| vs. | : | CIVIL ACTION |
| | : | |
| NICE SYSTEMS, INC., NICE | : | **AMENDED COMPLAINT** |
| SYTEMS LATIN AMERICA, INC., | : | **AND JURY DEMAND** |
| JOHN DOES 1-10, ABC CORPS. | : | |
| 1-10, RICHARD ROES 1-10 and | : | |
| DEF CORPS. 1-10(fictitious | : | |
| names representing one or more: | | |
| unknown defendants), | : | |
| | : | |
| Defendant(s). | : | |
| | : | |

Plaintiff, **EDUARDO GORDON**, residing at Julian Alvarez 1364,

(1414) CABA, Argentina, by way of Complaint herein states:

### ALLEGATIONS RELEVANT TO ALL COUNTS

1.   At all times relevant hereto, Plaintiff Eduardo Gordon

("Plaintiff") was and is a resident of Buenos Aires, Argentina.

2.   At all times relevant hereto, Defendants NICE SYSTEMS,

INC. and NICE SYSTEMS LATIN AMERICA, INC. (collectively "NICE

Systems") were and are an enterprise software solutions company,

operating and doing business at 301 Route 17, Rutherford, New

Jersey.

3.     On or about November 16, 2009, Plaintiff entered into a Consulting Agreement with NICE Systems, a copy of which is annexed hereto as Exhibit A. Plaintiff was paid on the basis of a Sales Incentive Plan and Goal Sheet. A copy of the Sales Incentive Plan is annexed hereto as Exhibit B, and a copy of the Goal Sheet is annexed hereto as Exhibit C.

4.     Plaintiff was engaged as a Sales Manager for Latin America and was responsible for sales. In addition to commissions for sales, Plaintiff also earned commissions on services including installation, maintenance, and training relating to his product lines for NICE Systems. Plaintiff's compensation was based upon several product lines including NiceVision (NV), Public Safety (PS), and Situation Management (SMS).

5.     During his relationship with NICE Systems, Plaintiff facilitated a transaction entitled the Secure City Project for Tegucigalpa, Honduras (the "Hercules Project"), in which the Honduran Government engaged NICE Systems as a subcontractor. As a result, NICE Systems was to receive approximately $25 million in or about 2011. The NV, PS, and SMS product lines were the only product lines involved in the sale. Upon information and belief, the contract for the Hercules Project also included services and maintenance for these products.

6.     In connection with the Hercules Project, Plaintiff, among other things, attended several meetings in Honduras with the

Sales Team, the Minister of Honduras, the local business partner, the integrator of the project, banks, tax advisors, local installers, and others. Plaintiff further provided a summary report with his observations and recommendations following the first meeting, created an Executive Summary for the project. Plaintiff also translated the contract for the Hercules Project into Spanish, checked compliance with local laws for the terms of the contract and made recommendations for modifications to NICE Systems' attorney. As an Electronic Engineer with a degree from Buenos Aires University, Plaintiff also reviewed and corrected technical mistakes in the Contract and suggested modifications and revisions. Furthermore, Plaintiff used his own contacts at HSBC in Honduras to make introductions to obtain financing for the project.

7.    Plaintiff played a substantial and crucial role in the facilitation of the Hercules Project and was recognized in emails from Defendants recognizing him for his hard work and contribution.

8.    Upon information and belief, NICE Systems was paid approximately $25 million in connection with the Hercules Project.

9.    However, when commissions were calculated for 2011, the year that the Hercules Project was consummated, Plaintiff was only paid approximately $37,000, far less than what would be due to him on a $25 million sale primarily involving the NV/PS/SMS product lines.

10.   At the end of 2011, Plaintiff's consultant services were terminated by Defendant NICE Systems.

11.   Plaintiff made ongoing complaints to NICE Systems that his compensation for the Hercules Project was not measured accurately in accordance with the Sales Incentive Plan and Goal Sheet. NICE Systems responded that Plaintiff was paid his commissions at a discounted rate because only 9.09% of the project consisted of the NV/PS/SMS product lines for which he was responsible. NICE Systems has provided no basis for reaching the conclusion that only 9.09% of the Hercules project consisted of the NV/PS/SMS product lines. There were no other product lines nor services that were included in the Hercules Project other than the ones related to NV/PS/SMS.

12.   In or around 2013, NICE Systems informed Plaintiff that it believed it had made a mistake and recalculated the commission, paying Plaintiff an additional $37,000.

13.   NICE Systems later alleged that the remainder of the project was designated as another product line referred to as "S2", but S2 is not defined in any document and the Billing Chart for the project does not correlate line items on the chart with any tangible product or services.

14.   The entire Hercules project was billed as product only, despite the fact that the contract included services and maintenance for which Plaintiff would have been entitled to

commissions, and the only products sold were PS, NV, and SMS. The installation, maintenance, service, margins and profits on these products were all commissioned in accordance with Plaintiff's Goal Sheet (See Exhibit C).

15. Therefore, Plaintiff's commission should have been calculated as though the PS, NV, and SMS products were the only components of the Hercules Project, using the Quotas and Multipliers set forth in the 2011 Goal Sheet that he was provided during his tenure with NICE Systems.

16. Upon information and belief, the total amount of the Hercules Project upon which Mr. Gordon's commission was to be calculated totaled twenty four million, nine hundred twenty four thousand, three hundred fifty dollars ($24,924,350.00), which, upon information and belief, is the amount that NICE was to be paid for the Hercules Project. Therefore, Plaintiff is entitled to a total commission of nine hundred thirty seven thousand, two hundred sixty four dollars, and eighty two cents ($937,264.82), providing a credit to NICE Systems of $74,000.00 for payments already made by NICE Systems to Plaintiff. Thus, Mr. Gordon is entitled to outstanding commissions from NICE Systems of approximately eight hundred sixty three thousand, two hundred sixty four dollars and eighty two cents ($863,264.82).

17. Additionally, Plaintiff is owed unpaid bonuses unrelated to the Hercules Project, in the amount of approximately $80,000.00.

## COUNT ONE

### BREACH OF CONTRACT

18. Plaintiff repeats and re-alleges each of the statements set forth in the preceding paragraphs as if same were set forth at length herein.

19. As set forth in the Consultant Agreement, the Plaintiff has fully performed his obligations to NICE Systems pursuant to his Consulting Agreement, Sales Incentive Plan, and Goal Sheet ("Agreements").

20. Defendants NICE Systems' failure to make payment under the terms of the Agreements constitutes a material breach of the terms and conditions of the Agreements.

21. As a direct and proximate result of the aforementioned conduct, Plaintiff has suffered and will continue to suffer economic loss.

**WHEREFORE,** the Plaintiff demands judgment against the Defendants, jointly and severally, for the following:

1) An accounting of all sums due and owing to the Plaintiff;

2) compensatory damages;

3) special damages;

4) pre-judgment interest;

5) counsel fees;

6) costs of suit; and any other relief that the court deems to be just and equitable.

**COUNT TWO**

**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

22. Plaintiff repeats and re-alleges each of the statements set forth in the preceding paragraphs as if same were set forth at length herein.

23. The parties agreed that Plaintiff would be compensated based on the performance of the PS, NV, and SMS Product Lines.

24. Upon information and belief, the Hercules Project resulted in NICE Systems receiving payment in the approximate amount of $25 million, all of which was attributable to the performance of the PS, NV, and SMS Product Lines and thus was the basis for the calculation of the Plaintiff's commissions.

25. NICE Systems misrepresented to the Plaintiff that the success of the Hercules Produce was not 100% attributable to the performance of the PS, NV, and SMS Product Lines and compensated him at an arbitrary, discounted rate.

26. NICE Systems acted in bad faith to deprive Plaintiff of the benefit of the bargain between the parties.

27. As a direct and proximate result of the aforementioned conduct, Plaintiff has suffered and will continue to suffer economic loss.

**WHEREFORE,** the Plaintiff demands judgment against the Defendants, jointly and severally, for the following:

1) An accounting of all sums due and owing to the Plaintiff;

2) compensatory damages;

3) special damages;

4) pre-judgment interest;

5) counsel fees;

6) costs of suit; and any other relief that the court deems to be just and equitable.

### COUNT THREE

### CONVERSION

28. Plaintiff repeats and re-alleges each of the statements set forth in the preceding paragraphs as if same were set forth at length herein.

29. The Plaintiff is lawfully entitled to the commissions and bonuses that he earned during his performance of work for NICE Systems.

30. In refusing to pay the Plaintiff for the work he performed, NICE Systems converted and deprived the Plaintiff of assets to which he was lawfully entitled.

31.  As a direct and proximate result of the aforementioned conduct, Plaintiff has suffered and will continue to suffer economic loss.

**WHEREFORE,** the Plaintiff demands judgment against the Defendants, jointly and severally, for the following:

1) An accounting of all sums due and owing to the Plaintiff;

2)  compensatory damages;

3)  punitive damages;

4)  special damages;

5)  pre-judgment interest;

6)  counsel fees;

6)  costs of suit; and any other relief that the court deems to be just and equitable.

## COUNT FOUR

### UNJUST ENRICHMENT/QUANTUM MERUIT

32.  Plaintiff repeats and re-alleges each of the statements set forth in the preceding paragraphs as if same were set forth at length herein.

33.  In performing work for NICE Systems including facilitating the Hercules Project, the Plaintiff conferred a benefit on NICE Systems.

34.   The Plaintiff conferred this benefit on NICE Systems with the reasonable expectation that he would be compensated in accordance with the Sales Incentive Plan and Goal Sheet, and that he would be paid any bonuses he earned in accordance with NICE Systems' compensation policies.

35.   The Plaintiff conferred this benefit under circumstances that should have put NICE Systems on notice that the Plaintiff expected to be paid his earned compensation.

36.   In failing to pay the Plaintiff his earned compensation, NICE Systems has unjustly enriched itself.

37.   As a direct and proximate result of the aforementioned conduct, Plaintiff has suffered and will continue to suffer economic loss.

**WHEREFORE**, the Plaintiff demands judgment against the Defendants, jointly and severally, for the following:

1) An accounting of all sums due and owing to the Plaintiff;

2)  compensatory damages;

3)  punitive damages;

4)  special damages;

5)  pre-judgment interest;

6)  counsel fees;

6)  costs of suit; and any other relief that the court deems to be just and equitable.

### JURY DEMAND

Plaintiff hereby demands trial by jury as to all matters herein.

### TRIAL DESIGNATION

Pursuant to R.4:5-1, Kathryn Kyle Forman, Esq., is hereby designated as trial counsel for the within matter.

### CERTIFICATION

I certify, pursuant to R. 4:5-1, that the matter in controversy is not the subject of any other action or arbitration proceeding, now or contemplated, and that no other parties should be joined in this action at this time.

**PIRO, ZINNA, CIFELLI,
PARIS & GENITEMPO, LLC**
Attorneys for Plaintiff

BY: _____
Kathryn Kyle Forman, Esq.

Dated: January 24, 2018

Exhibit A

## NICE SYSTEMS LATIN AMERICA INC.

### CONSULTING AGREEMENT

This Consulting Agreement (the "Agreement") is made and entered into as of November 16, 2009 (the "Effective Date") by and between NICE Systems Latin America Inc. ("NICE"), and Eduardo Gabriel Gordon, with an address at Julian Alvarez 1364, (1414) Ciudad de Buenos Aires, Argentina (the "Consultant"), pursuant to the following terms and conditions:

### WITNESSETH:

WHEREAS, NICE desires to retain the Consultant to perform certain consulting services specified herein; and

WHEREAS, Consultant represents that he desires to be engaged in the capacity of independent Consultant in accordance with the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. **Consultant's Duties and Description of Services**

    (a) The Consultant agrees to perform the duties specified in all subsections of this Section 1 ("Consultant's Duties"), as well as such other duties requested by NICE which are or come to be necessary and reasonably related to the successful completion of Consultant's Duties.

    (b) Consultant shall provide consulting services to NICE within the Countries of Argentina, Brazil, Chile, Columbia, and Mexico ("Territory"), where such services shall include, but are not be limited to: researching the market for prospect customers for NICE's products; managing product distribution partnerships; and managing relationships with NICE's customers.

    (c) This Agreement does not prevent NICE from performing the activities set forth hereby directly in the Territory or by means of other consultants.

## 2.   Consideration and Taxes

(a)   In consideration of the Consultant's Duties to be performed by the Consultant and upon presentation of an invoice for consulting services from Consultant, NICE agrees to pay Consultant a total fee of Sixty Thousand US Dollars (US$ 60,000.00), in equal monthly payments, in the amount of Five Thousand US Dollars (US$5,000.00) each, over the first twelve (12) month period.

(b)   NICE hereby undertakes to carry out the monthly payment of the consultant's fees set forth in item (a) above to Consultant in a bank account to be specified by Consultant, which payment shall be due on the last business day of each and every month until and including the termination of this Agreement.

(c)   In consideration of the Consultant's Duties performed by the Consultant and upon presentation of an invoice from Consultant, NICE agrees to pay Consultant a success fee of no more than One Hundred Thousand US Dollars (US$ 100,000.00), based on the criteria set forth under NICE's Commission Rules.

(d)   NICE shall not pay Consultant any other fees or compensation other than those described in items 2(a) and (c) above.

(e)   Upon presentation of an invoice, NICE shall reimburse Consultant for pre-approved expenses incurred in activities developed within the scope of this Agreement, as described in Section 1 above, such as meetings with partners and customers and travel for training or business related, provided that (i) such activities are unquestionably related to the development of NICE's businesses in Territory; and (ii) such expenses are previously approved by NICE in writing.

(f)   NICE shall have no obligation to make any payment pursuant to this Agreement unless Consultant is in compliance with all its covenants, agreements and warranties hereunder.

(g)   Any and all taxes levied on any amounts to be paid by NICE to Consultant, whatsoever its nature, shall be fully borne by the Consultant, pursuant to the provisions set forth under the applicable tax legislation.

3.  **Duration and Termination**

(a)  This Agreement shall be effective for a period of 12 (twelve) months counted as of the effective date.  Upon mutual consent of the parties, this Agreement may be renewed or extended beyond the initial period, for successive periods of 12 (twelve) months. All such renewals or extensions must be in writing and may be executed by an addendum executed by Consultant and an authorized representative of NICE.

(b)  This Agreement may be terminated as follows:

(i)  By either party, within ninety (90) days in advance to the date of termination of this Agreement, or any renewal termination date thereof, by sending a written notice to the other, which must be delivered either by certified mail or hand delivery. In this case, no reimbursement and/or charges whatsoever shall be due to either party and Consultant's sole right shall be for the Consultant's Duties actually performed by the Consultant up to the date of termination and compensable according to Sections 2(a) and (c) above, on a *pro rata* basis.

(ii)  Immediately, by NICE, in the event of a breach by Consultant of any of Consultant's obligations under this Agreement.  In such event, the Consultant's sole right to compensation shall be for the Consultant's Duties actually performed by the Consultant up to the date of termination and compensable according to Section 2(a) and (c) above, on a *pro rata* basis.

(c)  Upon termination or expiration of this Agreement, the Consultant shall, within five (5) calendar days, return or destroy as directed by NICE any and all property, documents, records, notes, data, memoranda, models, marketing materials, and any confidential or proprietary information or documents that are of the property of NICE and in the control or possession of Consultant.

4.  **Independent Contractor Status**

(a)  NICE and Consultant understand and agree that Consultant will act solely as an independent Consultant and nothing in this Agreement shall be construed as an employment relationship between Consultant and NICE.  The Consultant, therefore, agrees to secure and maintain any and all of his insurance, licenses and/or permits required to perform any of the services contracted herein within the Territory, which are or come to be required under the law of each country in the Territory and under this Agreement.  Upon request, Consultant agrees to provide NICE with any and all appropriate documentation reflecting such insurance coverage and demonstrating compliance with any and all applicable local, State and Federal laws.

(b)  NICE shall have no right to control or direct the details, manner or means by

RJ#120961_v2                        — 3 —

which Consultant accomplishes the Consultant's Duties. Consultant shall retain and exercise the rights to control and direct the details, manner or means by which Consultant accomplishes Consultant's Duties.

     (c)    Consultant has no authority to and shall not place orders, bind, represent or speak for NICE for any purpose whatsoever, except if expressly authorized in writing to do so.

     (d)    During the term of this Agreement, Consultant is hereby authorized to use NICE's trademarks and marketing materials, provided that such use is made within the scope of this Agreement.

     (e)    NICE will record payments to Consultant on, and provide to Consultant, a United States Government Form 1099. NICE will not withhold any state or federal employment taxes on Consultant's behalf in Argentina. Consultant agrees to pay all such taxes in a timely manner and as prescribed by law.

     (f)    Consultant is not and will not be considered an employee for purposes of any NICE employee or employment policy or any employment benefit plan, nor will Consultant be entitled to any benefits under any such policy or benefit plan.

     (g)    Consultant must keep in place, at his sole cost and risk, an adequate business structure to perform his obligations under his agreement, including without limitation, maintaining and furnishing an office, employees and, as applicable, any other structure required to perform this Agreement. Consultant must strictly comply with its labor and social security obligations *vis à vis* its employees.

## 5.   **Other Work by Consultant**

     (a)    This Agreement does not impose an exclusivity obligation on NICE or Consultant. During the term of this Agreement, or any renewals thereof, the Consultant shall be free to provide its services in the Territory to entities other than NICE, with due regard to the provisions set forth under item (b) below.

     (b)    It is hereby expressly agreed that Consultant shall not render, under any circumstance, any kind of services to any entity which competes with NICE, in the Territory or abroad, including any company that sells telephone call recording, analysis and storage products, video recording (close circuit TV), analysis hardware and software products and provides video surveillance, control services and solutions to be used in public safety and security organizations.

RJ#120961_v2           **− 4 −**

## 6.   Indemnification

Consultant shall indemnify and hold NICE, its employees, officers and agents harmless from and against any and all claims, demands, losses, damages, costs, attorneys' fees, judgments and expenses that arise as a result of Consultant's performance of or failure to perform the Consultant's Duties, or by judgments, claims, or any other circumstances related to Consultant's employees.

## 7.   Nondisclosure and Use of Confidential Information

In connection with the performance of the Consultant's Duties, Consultant will be exposed to and have access to NICE's confidential and proprietary information and information that NICE's customers, vendors, and others have entrusted to NICE that may include, but is not limited to, costs, business affairs, future plans, employee compensation, employee personnel information, programs, databases, operations and procedures (collectively, "Information") which Consultant did not have access to prior to performing the Consultant's Duties for NICE, and which Information is of great value to NICE. Consultant at all times, both during and after any termination of this Agreement by either party, shall not in any manner, directly or indirectly, use any Information for Consultant's own benefit, or divulge, disclose or communicate in any manner, or otherwise make available such Information, unless if expressly authorized to do so in writing by a NICE's officer or legal representative. Information, as described under this section, does not include (i) information which was in the public domain at the time of disclosure to Consultant; (ii) information which is or becomes generally known or available to the public through no act or failure to act on the part of Consultant; or (iii) information the disclosure of which is required by law or court order, provided that Consultant provides NICE with a prior written notice of any such disclosure.

## 8.   Transfer and Assignment

This Agreement may not be assigned or transferred by Consultant. Should such an assignment or transfer occur, this Agreement shall become null and void, at the discretion of NICE, upon written notification by NICE to Consultant within five (5) days after NICE learns of such assignment or transfer. NICE may assign or transfer this Agreement at its discretion upon written notice to Consultant.

RJ#120961_v2                                    **– 5 –**

9.     **Remedies for Breach**

Consultant acknowledges that the restrictions contained in this agreement are reasonable as to time and scope, necessary to protect the legitimate interests of NICE, and are not unduly burdensome to Consultant. Without limiting NICE's rights to pursue specific performance or any other legal and equitable remedies available to it for any breach by Consultant of the covenants, agreements and warranties contained herein, Consultant acknowledges that a breach of said covenants, agreements and warranties would cause a loss to NICE that could not reasonably or adequately be compensated in damages in any action at law, that remedies other than injunctive relief could not fully compensate NICE for a breach of said covenants, agreements and warranties and that, accordingly, NICE shall be entitled to injunctive relief to prevent any breach or continuing breaches of Consultant's covenants, agreements and warranties as set forth herein.

10.     **Waiver**

Waiver by NICE of a breach of any provision of this Agreement or failure to enforce any such provision shall not operate or be construed as a waiver of any subsequent breach of any such provision or of NICE's right to enforce any such provision.  No act or omission of NICE shall constitute a waiver of any of its rights hereunder except for a written waiver signed by NICE's Chief Executive Officer.

11.     **Governing Law**

This Agreement shall be governed in all respects by the substantive laws of Argentina. Any controversy that arises between the parties in connection with this Agreement, its existence, validity, qualification, construction, scope, performance or termination will be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one arbitrator appointed in the accordance with the said Rules that Consultant and NICE acknowledge to know and accept.

12.     **Certification by Consultant**

Consultant certifies that all information and data provided by Consultant to NICE in order to obtain this Agreement or in response to NICE requests for information and data are accurate, complete and current as of the date of execution of this Agreement.

RJ#120961_v2                     — 6 —

## 13.  No Conflicting Agreements

Consultant represents and warrants that execution and performance of this Agreement does not conflict with any contract, commitment, agreement, understanding, arrangement or restriction, or any adjudication, order, injunction, or finding of any kind by any court, governmental entity or third parties, to which Consultant may be a party or by which Consultant may be bound.

## 14.  Counterparts

This Agreement shall be executed in two (2) counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

## 15.  Headings

All section headings herein are inserted for convenience only and shall not modify or affect the construction or interpretation of any provisions of this Agreement.

## 16.  Notices

All notices, requests, consents and other communications hereunder shall be in writing and addressed to the receiving party's address set forth below or to other address as a party may designate by notice hereunder, and shall be either (i) delivered by hand; (ii) sent by overnight courier; or (iii) sent by registered or certified mail, return receipt requested, postage prepaid.

If to NICE;

NICE Systems Latin America, Inc.
Attn: Legal Department
301 Route 17 North
10th Floor
Rutherford, NJ 07070
United States of America

RJ#120961_v2                    — 7 —

If to Consultant:

**Eduardo Gabriel Gordon**
Julian Alvarez 1364
(1414) Ciudad de Buenos Aires
Argentina

17.     **Severability**

If any provision of this Agreement shall be held to be invalid, inoperative or unenforceable for any reason, the unenforceability thereof shall not affect the validity of any other provision of this Agreement. Any such provision that is held to be invalid, inoperative or unenforceable shall be construed, reformed and enforced to effect the purposes of this Agreement to the fullest extent permitted by law.

18.     **Entire Agreement; Modifications**

This Agreement constitutes the entire agreement of the parties hereto, and all previous communications between the parties, whether written or oral with reference to the subject matter of this Agreement, are hereby canceled and superseded, provided that the confidentiality and non solicitation provisions of Consultant's terminated employment agreement shall survive the execution of this Consultant Agreement for the duration provided for in the employment agreement. No modification of this contract shall be binding upon the parties hereto, unless if in writing and duly signed by the respective parties hereto. This Agreement is effective when executed by both parties.

IN WITNESS WHEREOF, the parties to this Agreement have caused the same to be executed on the Effective Date written above.

NICE SYSTEMS LATIN AMERICA INC.


By: Eduardo Gabriel Gordon                    By:
                                              Title:

Date:                                          Date:


RJ#120961_v2                    — 8 —

# Exhibit B

**Sales Incentive Plan**
January 1 - December 31, 2011

---

## NICE Systems 2011 Sales Incentive Plan

### - Americas Security -

This document sets forth the NICE Systems 2011 Sales Incentive Plan ("Plan") for Sales Representatives. This Plan as well as the Goal Sheet and 2011 President's Club policy must be reviewed and acknowledged by each Sales Representative prior to any incentive payments in 2011.

CONTENT:

1. PURPOSE
2. RESPONSIBILITIES OF THE PARTICIPANT
3. DEFINITIONS
4. INCENTIVE GUIDELINES
5. SPIFS
6. GENERAL CONDITIONS
7. GOAL SHEETS
8. PRESIDENT'S CLUB
9. TERRITORY / ACCOUNT ASSIGNMENTS / DOUBLE INCENTIVE APPROVAL /SPLITS
10. WINDFALLS
11. ACKNOWLEDGMENTS AND TERMINATION OF EMPLOYMENT
12. PLAN ADMINISTRATION
13. GENERAL PROVISIONS

**Sales Incentive Plan**
January 1 - December 31, 2011

---

### 1. <u>PURPOSE</u>

The objectives of this Plan are to define the terms under which incentives are calculated, earned and paid, to motivate the Sales Representative (referred to as the "Participant") to achieve budgeted sales and growth goals for his or her assigned Territory and to reward the Participant for superior and outstanding achievements.

### 2. <u>RESPONSIBILITIES OF THE PARTICIPANT</u>

It is the Participant's responsibility to actively develop their assigned Territory/Accounts and to sell in the assigned Territory/Accounts the products, services and Maintenance of NICE. The Participant continues to have responsibilities after a purchase order is accepted to assist in resolving customer issues until payment is made by the customer and a full transition is made to the Americas Services Organization "Services Team". The Participant shall not sell or deal, directly or indirectly, any products, services and/or Maintenance that Participant has not been authorized to sell, nor will Participant earn any incentive on such products, services and/or Maintenance sold.

### 3. <u>DEFINITIONS</u>

#### 3.1. Base Salary:

The base salary is the semi-monthly fixed payment which is paid to the Participant. The base salary will vary with level of experience, tenure and role. The base salary is unaffected by amounts earned or paid in accordance with the Incentive Plan. There are 24 pay periods in a calendar year.

#### 3.2. Back Office:

Includes only Back Office applications sold with enterprise solutions. For purposes of this Plan, Back Office is listed under other enterprise divisions and will be noted by a market segment.

#### 3.3. Bonus:

Refers to all payments described in section 5 .

#### 3.4. Booking:

A Booking is an Order which complies with the requirements of The NICE Global Bookings Policy and has been approved by the Regional VP, Finance. All products, services, first year maintenance and renewal maintenance are eligible for Bookings in accordance with the Participant's Goal Sheet.

**Sales Incentive Plan**
January 1 - December 31, 2011

### 3.5. Cause:

A Participant's willful or gross neglect of employment duties; committing fraud, misappropriation or embezzlement in the performance of his or her employment duties; conviction of a felony or other crime involving fraud or moral turpitude; willfully engaging in conduct injurious to the Company (defined below) or in violation of Company policies; or breaching any agreement between Participant and the Company.

### 3.6. Company:

Any division/unit or subsidiary of NICE Systems, LTD.

### 3.7. Cross Sell Deals:

Any Booking in which a product, service, or maintenance from one Division/Unit or Subsidary  of the Company is being sold to an account through an approved lead from a different Division/Unit or Subsidary of the Company.

### 3.8. Customer Satisfaction Component:

This component is measured and paid annually based on a customer satisfaction objective set at the beginning of the year.  Participants can overachieve this target by up to 300%.  Participants must be employed at the time of payment to receive this bonus.  Payment (for the calendar year 2011)will be made no later than March 31, 2012.

### 3.9. Cybertech ("CT"):

Includes only Cybertech applications sold with Enterprise or Security solutions (Financial code: Div. 19 for Enterprise and Div. 36 for Security).

### 3.10. De-Booking:

A De-Booking is a reversal of a Booking, in whole or part, either because the customer has informed the Company that it will not pay for a Purchase Order ("PO"), or the Company has made a determination, in its sole and absolute discretion, that a customer which is delinquent in paying for a PO, in whole or part, is unlikely to pay the balance of the PO, or there is a credit given to the customer for returned product or services undelivered per the original PO.

### 3.11. Goal Sheet:

The Goal Sheet is a document that describes and manages a Participant's annual Quota and crediting components.  The Goal Sheet is signed annually by each Participant.

### 3.12. Incentive:

**Sales Incentive Plan**
January 1 - December 31, 2011

---

An incentive is a payment based on a percentage of the dollar amount of products, services and Maintenance which have been Booked by the Company subject to deductions for De-Bookings.

### 3.13. Maintenance:

**3.12.1.** **First Year Maintenance:** This is the first year maintenance sold to a customer with new product or a change in maintenance plan that results in an increase in the annual maintenance.

**3.12.2.** **Renewal Maintenance:** This is the continuation of an existing maintenance contract for any period of time. An increase to an existing contract amount will not constitute First Year Maintenance unless it applies to the defined terms in Section 3.11.1.

### 3.14. Interaction Analytics:

Includes only Interaction Analytics applications within the IBA GBU solutions (Financial code: Div. 23)

### 3.15. New Customer:

A customer who has not previously purchased any product, services or maintenance from the Company directly or indirectly within the Americas Region.

### 3.16. NICE Vision ("NV"):

Includes all business applications solutions, services and maintenance for NICE Vision Products. (Financial code: Div. 30)

### 3.17. Non - NICE Product / Component:

Any product and/or component included in the PO which is not the sole intellectual property of the Company.

### 3.18. On Target Incentives:

The annual target amount a Participant will receive if 100% of Quota is obtained. This amount does not consider product differences if Participants receive a different multiplier for various product lines.

### 3.19. Order:

An approved PO from a valid customer or partner that displays a commitment of payment to the Company for products, services and/or maintenance.

### 3.20. Public Safety ("PS"):

Includes all business applications solutions, services and maintenance for Public Safety Products. (Financial code: Div. 35)

PROPRIETARY AND CONFIDENTIAL FOR INTERNAL USE ONLY

**Sales Incentive Plan**
January 1 - December 31, 2011

---

### 3.21. Quality Management ("QM:):

Includes only QM applications sold with QM solutions (Financial code: Div. 25).

### 3.22. Quota:

Each Participant in this Plan will have one or more Quota(s) composed of product, services, and/or maintenance Bookings, and such Quota(s) will be set out in Participant's individual Goal Sheet. In some cases individuals will also have Booking targets that will be calculated to determine qualification for President's Club (attached hereto as Exhibit 1).

### 3.23. Quota Retirement:

Quota Retirement is attained through a valid Booking by the Company. The Booking is then credited against the Participant's Quota according to the Participant's Goal Sheet. The retirement of Quota based on Bookings may be reversed by De-Bookings.

### 3.24. Real Time Impact ("RTI"):

Includes all business applications solutions, services and maintenance for RTI Products. (Financial code: Div. 27)

### 3.25. Situation Management (SMS):

Includes all business application solutions, services and maintenance for SMS, Situation Management Systems. (Financial code: Div. 42)

### 3.26. Systems & Recording ("S&R"):

Includes all business applications solutions, services and maintenance for S&R Products. (Financial code: Div. 20)

### 3.27. Variable Component:

The variable component of the Plan for each Participant will vary based on experience, tenure and role.

### 3.28. Workforce Management ("WFM"):

Includes all business applications solutions, services and maintenance for IEX and PM (Performix) products. (Financial code: Div. 21 & 22)

**Sales Incentive Plan**
January 1 - December 31, 2011

4.  **INCENTIVE GUIDELINES:**

4.1.  Earned Incentive:

Incentives will only be earned for Booked orders, subject to deductions for De-Bookings. If a De-Booking occurs, in whole or part, then incentive paid based on such Booking will be deducted by the Company after such De-Booking in the calculation of incentives for subsequent Bookings, or may be subject to repayment to the Company by the Participant. The Company may deem a De-Booking to occur if a Booking has not been paid in full within 6 months after the Booking occurs. If, following a De-Booking, the Booking is subsequently paid by the customer, then an incentive will be earned when the Booking is paid (subject to the limitations in Section 11.4, "Termination of Employment"). To the extent a Booking has been applied to retire Quota, and resulted in a payment based on the retirement of Quota, a De-Booking will result in a recalculation of such Quota achievement to account for the De-Booking, and any resulting over-payment will be subject to recoupment from subsequent Bonuses and/or Incentive, or repayment.

4.2.  Regular Incentive Payments:

Incentives will be paid as a percentage of the Participant's On Target Incentives and will be based on the percentage of Quota achievement. Multipliers of a base rate of On Target Incentives divided by Quota will be used per the Participant's individual Goal Sheet. Participants with more than one Quota will have a weighted component that will be taken into account. For certain positions, there will be a difference in payment per division for products and maintenance only. Quota Retirement will be 100%, and only Incentive Payment will be paid accordingly: 100% for PS, NV, SMS not in a vertical, and CT products; 100% for PS, SMS not in a vertical, and CT maintenance; 125% for Organizer, SMS within a vertical, and enterprise applications (i.e. – QM applications, WFM, IA, RTI, and Back Office) products; 125% for Organizer, NV, SMS within a vertical, and enterprise applications (i.e. – QM applications, WFM, IA, RTI, and Back Office) maintenance. Certain positions that only sell one product line will not receive this Incentive Payment differential (115% as opposed to 125%). This product/maintenance difference will be noted on a Participant's Goal Sheet if relevant. All services regardless of division will retire Quota at 100% and incentive payment will be paid at 70%. If maintenance renewal is applicable, it will retire Quota and receive incentive pay based on 100%. Individuals may reference their goal sheet for more information.

4.3.  Maintenance Incentives:

Our Maintenance business is critical to our future success as a software company. As a result the Participant will be eligible for Maintenance Incentives as follows:

4.3.1. First Year Maintenance within the warranty period – If the maintenance is booked during the warranty period for product and services, the Participant will receive 100% Booking credit.

PROPRIETARY AND CONFIDENTIAL FOR INTERNAL USE ONLY

**Sales Incentive Plan**
January 1 - December 31, 2011

4.3.2. First Year Maintenance after expiration of warranty - No Booking credit will be received and no incentive will be paid on any Maintenance PO issued after warranty expiration, unless specifically approved in writing by the Regional President, the VP, Service Operations and the VP, Finance.

4.3.3. First Year Maintenance through Avaya -- In order to receive credit on Maintenance Bookings through Avaya, the Company must receive the confirmed maintenance order from Avaya via the NICE Americas Maintenance Team on the following quarterly Maintenance PO from Avaya after the time of Booking.

4.3.4. Multi-Year Prepaid Maintenance -- Booking credit towards quota for a Multi-Year Prepaid Maintenance deal will be for the first year portion of the deal only.  In addition, the Participant will receive a commission payment for the prepaid portion of the deal beyond the first year.  This additional Incentive payment (beyond the first year maintenance) will be paid at the rate of On Target Incentives / Annual Quota Target.

## 4.4.  Non-NICE Components Included on a PO :

Any non-Company products or components being sold into an enterprise division (S&R, RTI, IA, CT (Div. 19), WFM) will NOT be eligible for incentive or bookings credit unless a written exception is made by the Regional President and the Regional VP, Finance.  This is not relevant for the security divisions (PS, NV, SMS, and CT (Div. 36).

## 4.5  Cross Region Deals (International):

In some cases, Participants may close a deal that is shipped outside of the Americas Region.  In such instances, when the deal is booked, the Booking credit goes to that region.  In pre-approved cases, Participants can retire Quota for 30% of the Bookings and receive regular Incentive payment as well as an additional 70% Incentive payment to be paid at a rate of On Target Incentives / Annual Quota Target. Approval must be given by the Presidents of the relevant regions.  An exception form will be required for all such cases.

## 5.  SALES PERFORMANCE INCENTIVE FUNDS ("SPIFS"):

SPIFs may be announced by the Regional President and/or VP, Security, Public Safety and Banking, NICE Americas / VP, Security, Transportation and Utilities, NICE Americas.  This will be announced by a written e-mail and typically will have a defined period of eligibility.

## 5.1. Cross Sell Deals:

5.1.1.In a case of Cross Sale the booking and the revenue will be divided as follow: 30% will be assigned to the Division/Unit which holds the account (Lead Owner Div./Unit) and 70% will be

**Sales Incentive Plan**
January 1 - December 31, 2011

assigned to the Division/Unit which provide the product (Deal owner Div./Unit)Process: In order to be eligible for this special 'split' and special bonus describe below, the relevant president of the Div./Unit needs to define this deal as a Cross Sale deal prior to receiving a PO.

5.1.2. Special Bonus:

5.1.2.1.　　On top of the Quota credit for 30% of the deal, the Participant who originally generated the process (Lead Owner) will also be eligible for a Special Bonus equal to the commission s/he may have been receive forBooking equal to 70% of the deal (which means s/he will receive, over all, Quota credit for 30% of the deal and Special Bonus for 70% of the deal).

5.1.2.2.　　In addition to the Quota credit for 70% of the deal, the sales Rep who owns the deal (Deal Owner) will also be eligible for a Special Bonus equal to the commission s/he may have been receive for Booking equal to 30% of the deal (which means s/he will receive, over all, Quota relief for 70% of the deal and special bonus for 30% of the deal).

5.1.2.3.　　The Special bonus referred to in this section will only apply to the Participant and not to the Solution Engineers and/or the sales managers and/or the overlay sales managers who will receive their commission on the relevant Bookings assigned to their units.

5.2. **New Customer Bonus ("NC Bonus"):**

5.2.1. This bonus will be applicable for Participants who are in the role of direct sales managers only and will not apply for managers or Participants within the following teams; Market Expansion, RTI, Back Office, Business Solutions, Sales Engineers and Solution Architects.

5.2.2. The size of the bonus will depend on the amoung of Product, Services, and maintenenace sold by NICE and listed on the purchase order. The bonus will be divided 60% to the direct sales manager, 20% to the overlay and 20% to the Sales Engineer.

5.2.2.1.　　PO Amount for $250,000 – NC Bonus Amount of $5,000

5.2.2.2.　　PO Amount for $1,000,000 – NC Bonus Amount of $10,000

5.2.2.3.　　PO Amount for $2,000,000 – NC Bonus Amount of $20,000

5.2.2.4.　　PO Amount for $3,000,000 – NC Bonus Amount of $30,000

5.2.2.5.　　PO Amount for $4,000,000 – NC Bonus Amount of $40,000

5.3. **Million Dollar Club:**

5.3.1. Sales Managers (direct/overlay/rollup) closing a $1M PO (must be a single PO) will receive a bonus of $5,000.

5.4. **Conops:**

PROPRIETARY AND CONFIDENTIAL FOR INTERNAL USE ONLY

**Sales Incentive Plan**
January 1 - December 31, 2011

5.4.1. The Direct Sales Manager will receive a $10,000 bonus for the first two Conops  (>250k)
defined for each vertical (Globally).

5.4.2. Approval for this bonus will be given by the Global President of Security.

## 6.  GENERAL CONDITIONS FOR  BONUSES AND INCENTIVE

### 6.1.  Payment Frequency:

Calculations and payments of Incentives and Bonuses will be made 45 days after the close of any given
month or quarter for Bookings (net of De-Bookings) in that period.  For example, for January Bookings
(net of De-Bookings), Incentives and Bonuses will be reconciled and paid on March 15th.  Incentive and
Bonuses will be paid on a monthly or quarterly basis  depending on the Participant's Goal Sheet.  A
Participant should refer to their Goal Sheet to determine payment schedule and frequency.

### 6.2.  Order Reports:

A Bookings report will be run once Order Administration closes out the relevant month.  This typically
occurs during the second week after the end of the month. Incentive and Bonus calculations will be
based on information contained within the Company ERP (Oracle). Any dispute over this data will be
corrected within the relevant system and the incentive calculation will be re-run based on such corrected
information.

### 6.3.  Communication:

The incentive statement will be calculated and will be communicated to the Participant. Managers will
have the opportunity to review payment prior to final  submission and Participants will have the
opportunity to review their statement prior to final payout.

### 6.4.  Regional VP, Finance Approval:

All Incentives, Bonus calculations and payment orders will be subject to review by the Regional VP,
Finance, who has full discretion to hold back any payment order for further inquiries before it is
considered a Booking.

### 6.5.  Exceptions:

Any additional payments outside the terms of this Plan will be considered an exception and will require
approval based on the incentive procedure approval matrix attached as Exhibit 2 hereto.

## 7.  GOAL SHEETS

Goal Sheets will be presented in the Incentive System for each Participant. Each Participant will be
required to approve their 2011 Goal Sheet prior to receiving any Incentive Payment.

## 8.  PRESIDENT'S CLUB

**Sales Incentive Plan**
January 1 – December 31, 2011

Eligibility for President's Club is determined according to the guidelines listed in the President's Club Policy (attached hereto as Exhibit 1) and the criteria in the Participant's Goal Sheet.

## 9. TERRITORY / ACCOUNT ASSIGNMENTS / DOUBLE INCENTIVE APPROVAL /SPLITS / TRANSITION ACCOUNTS

Incentive for a particular Participant is defined by territory and/or by account assignment, as set forth in the Participant's Goal Sheet. The relevant Regional VP and/or VP of Sales will define a relevant territory and/or accounts for each Participant. The Company reserves the right to prospectively adjust territory/account assignments to reflect current business conditions or due to headcount changes in a particular territory or with respect to a particular account. All territory/account changes after Quota has been set in the Participant's Goal Sheet must be approved in writing by the General Manager of the division or the Regional President. Appropriate Quota adjustments may also be made in the Company's sole discretion in the event of territory/account adjustments.

### 9.1. Splits

In certain circumstances, allocation of incentive to multiple Participants may be appropriate. All parties involved in a split scenario must have contributed to the sale, as evidenced, among other things, by activities documented to and approved by the Regional President. Whenever possible, incentive splits should be identified at the time the purchase order is placed. In order for credit to be given, splits must be communicated to and approved by the Regional President and communicated to the Sales Incentive Analyst within 5 days from the time of Booking. Appropriate split methodology will be subject to the discretion of the Regional President. Management reserves the right to alter the split after the sale is completed if new information comes to light regarding the activity involved in closing the sale. Total credit for splits will not exceed 100% of Booking Credit Amount unless otherwise approved by the exception approval process outlined in Exhibit 2.

### 9.2. Transition Accounts

In certain circumstances, territories/accounts may move from one Participant to another. In such cases, there may be a situation of a transition. In such cases, the receiving Participant will carry the Quota. If the Participant that originally owned the territory/account closes Bookings in a specified time frame, they will be eligible for incentive payment only without Quota Retirement. The incentive payment will be based on a flat rate of On Target Incentive / Quota Target. The Participant that newly carries the territory/account as well as the Quota Target will receive Quota Retirement without incentive payment during the specified transitional period. Transitions must be pre-approved by the Regional President or the General Manager of the division.

**Sales Incentive Plan**
January 1 - December 31, 2011

### 10. WINDFALLS

The Regional President shall have the authority, in their absolute discretion, to identify any potential sale as a "Windfall" and limit or cap any Incentive or Bonus which might otherwise be earned in connection with the Booking of such sale (a "Designated Sale"). In identifying a Designated Sale, the Regional President will consider whether the occurrence or magnitude of the potential sale is likely to be influenced by factors substantially outside the actions of the Company or any individual Participant. Affected Participants will be notified of such cases prior to Bookings when possible.

### 11. ACKNOWLEDGMENTS AND TERMINATION OF EMPLOYMENT

#### 11.1. Plan Participation Acknowledgement

To participate in this Plan and receive payments, each Participant must acknowledge receipt of this Plan and their Goal Sheet.. The Participant must agree to the terms and conditions contained in this Plan and Goal Sheet that define the payable Incentives and the designated accounts (if applicable), identify all products and services that the Participant is authorized to sell and specify how Incentives and other compensation will be calculated, earned and paid to the Participant. Incentive payments will not be paid until the Participant has acknowledged their Plan and Goal Sheet.

#### 11.2. Previous Plans

This Plan shall supersede all prior plans, agreements or understandings, oral or written, except with respect to compensation to be paid by the Company to the Participant for services performed by the Participant, and for orders and payments received from customers, prior to 2011. Any plan, agreement or understanding, oral or written, which purports to supplement, amend or modify this Plan must be approved in writing by the Regional President.

#### 11.3. Employment at Will

This Plan shall not constitute an agreement as to the term of employment of any Participant nor shall it in any way obligate the Company to retain the services of any Participant for a fixed period of time or at a fixed level of compensation or in any way restrict the Company's right to terminate the employment of any Participant at any time, with or without cause, or the Participant's right to resign from employment (subject to other contractual agreements and applicable laws). If a Participant fails to meet their quarterly objectives, Participant may be placed on probation. Once on probation, there may be a monthly review to determine the Participant's progress towards meeting their objectives. If there is no demonstrated progress towards meeting these objectives, corrective action may be taken by the Company, up to and

**Sales Incentive Plan**
January 1 - December 31, 2011

including termination of employment. Notwithstanding the above, the Company has the right to terminate employment without first putting Participant on probation, or before the end of any probation period

### 11.4. Termination of Employment and Plan Participation

11.4.1.1    If a Participant transfers to a position which is not covered by this Plan, then their participation in the Plan will cease as of the date such transfer becomes effective, unless the Company's President, in their sole and absolute discretion, decides to continue such Participant's Plan eligibility and participation. If a Participant's employment ends for any reason, then participation in the Plan will terminate as of the last day of employment, and the payment of base salary will terminate on the last day of employment.

11.4.1.2    For Participants who resign from the Company or are terminated for Cause, Incentive and Bonuses will be calculated based on Bookings received by the Company through the last day of Plan participation. For Participants who cease to be Participants in the Plan as a result of a transfer to another position in the Company or a termination of employment without Cause, Incentive and Bonuses will be calculated based on Bookings (for the Participant's Territory or accounts as they existed on the Participant's last day of Plan participation) received by the Company through the date which is thirty days after the last day of Plan participation.

11.4.1.3    Incentive and Bonus payments to employees who have resigned or been terminated will be paid in accordance with the Plan or as required by applicable laws, if such laws require earlier payment. All Incentive and Bonus payments, including any calculated after the last day of Plan participation and regardless of the reason for the Participant leaving the Plan, are subject to offset by deductions for De-Bookings that occur before the payments are made. The Company reserves the right to seek repayment of any Incentives and Bonus Payments with respect to which customer payments have not been received as of the Participant's last day of employment (in the case of resignation or termination for Cause) or as of thirty days after the last day of Plan participation (in the case of transfer or termination of employment without Cause). Should the Company determine to seek repayment of such Incentives and Bonus Payments, the Company will provide written notification to Participant of the amounts owed, and Participant shall repay the Company within thirty (30) days of receiving such notification from the Company.

## 12.  PLAN ADMINISTRATION

### 12.1.    Responsibility

The administration of this Plan is the responsibility of the Company's Regional VP, Finance, the Director of Sales Operations, and the Director, Compensation & Benefits ("Plan Administrator"). The Company reserves the right at any time to change prospectively all or any part of the Plan, including, without

**Sales Incentive Plan**
January 1 - December 31, 2011

limitation, changes to Base Salary, Bonuses, Incentives, Accounts, Quotas, Territory, Bookings, and De-Bookings, as well as to suspend or terminate participation in the Plan. The Participant will then acknowledge and execute the updated Plan.

### 12.2.   Changes
No alteration, modification or change to this Plan shall be effective unless authorized in writing and signed by the Regional President.

### 12.3.   Plan Interpretation
Any interpretation or determination that the Plan Administrator makes regarding the Plan, including without limitation determinations of eligibility, and amount and payment of Incentive, shall be final and conclusive. Nothing contained in this Plan shall be deemed to provide any Participant, employee or third party any right or interest under the Plan, except to the extent, if any, as the Plan Administrator may determine in writing in accordance with the provisions of the Plan.

### 12.4.   Dispute Resolution
Any dispute regarding the Plan shall be decided by the Company's President whose decision shall be final and binding.

### 12.5.   Approved Discount Levels
In order for Participant to be eligible to receive Booking Credit and respective Incentives and Bonuses, orders that include the following discounts require advance written approval by the designated individual prior to such Order being submitted to the Company:

- o   Discount on Products (Hardware and/or Software):

  - • Up to 40%              Regional VP
  - • Up to 50%              Division VP of Sales (Enterprise OR Security)
  - • Up to 70%              Regional President

- o   Discount on Services :

  - • Over 20%              Regional VP of Services  or Regional President

- o   Discount on Maintenance:

  - • Up to 10% discount      Any VP from the Services Org.

**Sales Incentive Plan**
January 1 - December 31, 2011

| | | |
|---|---|---|
| • | Up to 20% discount | Regional VP of Services + Regional VP, Finance |
| • | Up to 30% discount | Regional President + Regional VP Finance |
| • | Above 30% discount | Corp. VP of Global Services |

Any discounts that are not approved prior to Oder being received by the Company through proper channels will be subject to a incentive reduction of up to 100% by decision of the General Manager of the division or the Regional President.

13. **GENERAL PROVISIONS**

   a. All terms and conditions of this Plan are severable.  If any term or provision of this Plan, or any portion thereof, is held to be invalid, illegal or unenforceable, the remaining portions shall not be affected.

   b. The Plan shall be governed by and construed in accordance with the laws of New Jersey.

   c. No Participant or third party acting on behalf of or through a Participant shall have any power or right to transfer, assign, anticipate, hypothecate, mortgage, commute, modify or otherwise encumber in advance of any incentive, Bonus or other compensation payable hereunder, nor shall any of said obligations be subject to seizure for payment of debt, judgments, alimony or separate maintenance owed by a Participant, or be transferable by operation of law in the event of a bankruptcy, or otherwise.

   d. All payments under the Plan are subject to withholding taxes and any other amounts required to be withheld by law.

   e. Incentive and Bonus payments under this Plan are not to be considered for any purpose as part of the Participant's Base Salary or wages.

   f. Payment on any particular occasion of any Incentive or Bonus amount in accordance with this Plan shall not create the presumption that any further amount will be paid to the Participant thereafter under this Plan or otherwise.

   g. The Company reserves the right, in accordance with section 12.2 above, to amend, terminate and modify this Plan prospectively at any time in its sole discretion.

PROPRIETARY AND CONFIDENTIAL FOR INTERNAL USE ONLY

**Sales Incentive Plan**
January 1 - December 31, 2011

**Exhibit 1**

## 2011 PRESIDENT'S CLUB POLICY

1. ___Objectives:___

1.1. Rewarding the main revenue generators (sales) for outstanding performance

1.2. Global Sales excellence acknowledgment

1.3. Informal event which provide the CEO and Presidents with a chance to meet with the company's top sales performers

2. ___Mandatory Eligibility___

CEO

3. ___Performance Based Eligibility___

The below table is for Participants. In addition, VP of Solution Engineering and/or VP/Director of Service Sales with Quota > $20,000,000.

| Achievement is based on the size of Quota vs. the percent of achievement. | % Achievement for P-club |
|---|---|
| < = $3M | 125% |
| $3M < Quota < = $7M | 120% |
| $7M < Quota < = $10M | 115% |
| $10M < Quota < = $40M | 110% |
| ➢ $40M | 105% |

3.1. **Americas Sales VP (Enterprise, Security):**

Achieved at least **100%** of their annual booking target

3.2. **Sales Engineers:**

3.2.1. The number of eligible employees to be nominated by the regional president is 1 SE for every 5 non managers, Quota carrying sales members who meet the P-club criteria.

3.2.2. President discretion to who will attend based on vacancies allocated as noted above.

4. ___Discretionary Eligibility___

**Sales Incentive Plan**
January 1 - December 31, 2011

In addition to the performance based eligibility, each Regional President and Divisional President can grant this reward to one top performer from their region at their discretion as long as a minimum of five (5) non-managers achieve P-club criteria.

5. _General Eligibility_

5.1. Every Participant must be a Company active employee at the time of the event

5.2. Every Participant must be an active employee for at least nine (9) months during the relevant year (January-December).

5.3. Every Participant must achieve a minimum of $3,500,000 USD in Quota for the relevant year.

6. _Reward_

6.1. Each eligible employee chosen to participate in this event will have the right to participate in a unique annual global event, which will take place every year in a different region (Americas; EMEA; APAC)

6.2. Each eligible employee can come to the event with their spouse, partner or significant other.

6.3. The reward includes all related costs to the eligible employee and their spouse/partner/ significant other, excluding any gross-up requirements per region.

6.4. If for any reason an eligible employee decides not to participate in the event, they will not be entitled to any type of reimbursement (monetary or non-monetary).

** Note: President's Club is a Company Benefit and as such will show as earnings on your W-2.

**Sales Incentive Plan**
January 1 - December 31, 2011

<u>**EXHIBIT 2: EXCEPTION REQUEST FORM**</u>

## Incentive Plan - Change Request Form

| Recommendation/Request |
|---|
| |
| |

| Population |
|---|
| |
| |

| Justification |
|---|
| |
| |

| Estimated Cost |
|---|
| |
| |

| Resource |
|---|
| |
| |

Approvals:

| | Title | Name | Approval Date |
|---|---|---|---|
| Region | VP of Sales | | DD-MMM-YYYY |
| | VP, Finance | | DD-MMM-YYYY |
| | President | | DD-MMM-YYYY |
| Corporate | **Division Presidents** (if changing plan objectives) | | DD-MMM-YYYY |
| | **Corporate VP, Finance / CFO** (if cost > 25K and/or if total annual accumulated changes >100k) | | DD-MMM-YYYY |

PROPRIETARY AND CONFIDENTIAL FOR INTERNAL USE ONLY

# Exhibit C

Plan Summary: YEAR-2011

Last modified: 10/03/2011 04:29 PM GMT

| | | | |
|---|---|---|---|
| Company: | NICE Systems LTD | Customer Satisfaction Component Weight: | 6.00 % |
| Name: | Eduardo Gordon (59033) | Booking Component Weight: | 57.00 % |
| Job Title: | Regional Sales Manager Consultant | Booking 2 Component Weight: | 38.00 % |
| Manager: | Marcus Moraes (10719) | MBO Component Weight: | 0% |
| Base Salary: | 80,000.00 USD | Contibution Margin Component Weight: | 0% |
| Target Incentive: | 80,000.00 USD | Leads Component Weight: | 0.00 % |
| % of Target Incentive from Base: | 100.00 % | Tier 1 Multiplier: | 70.00 % |
| On Target Earnings: | 160000 | Tier 2 Multiplier: | 130.00 % |
| Currency: | USD | Tier 3 Multiplier: | 150.00 % |
| Payment Frequency: | Monthly | Tier 4 Multiplier: | 180.00 % |
| Payment Per Lead: | | Tier 5 Multiplier: | 250.00 % |
| | | Tier 6 Multiplier: | 160.00 % |
| | | Tier 7 Multiplier: | 120.00 % |

## 2011 Goal Sheet and Plan Document Acceptance

| | | | | |
|---|---|---|---|---|
| PS | 100% | 70% | 100% | 100% |
| Cybertech | 100% | 70% | 100% | 100% |
| NV | 100% | 70% | 125% | 100% |
| SMS not in a vertical | 100% | 70% | 100% | 100% |
| SMS in a vertical | 125% | 70% | 125% | 100% |
| Enterprise Applications (sold directly - not part of Cross Sell) | 125% | 70% | 125% | 100% |

*Note - Named Verticals = Transportation, Utilities, Public Safety, and Banking

Bookings Commission is calculated using a MARGINAL RATE calculated using the following formula:

Marginal Rate = (Target Incentive/ Annual Quota) * Commission Weight * Component Weight * Tier # Multiplier

**Plan Quotas**

| | QTR-1-2011 | QTR-2-2011 | QTR-3-2011 | QTR-4-2011 | YEAR-2011 |
|---|---|---|---|---|---|
| 2010 Americas Enterprise Total Anuani Quota (USD) | 0.00 | 0.00 | 0.00 | 0.00 | 2,250,000.00 |
| 2011 Americas Security Total Annual Quota (USD) | 0.00 | 0.00 | 0.00 | 0.00 | 1,802,500.00 |
| 2011 Americas Security Total Annual Quota 2 (USD) | 0.00 | 0.00 | 0.00 | 0.00 | 5,250,000.00 |

**Commission Rates**

| 1. Americas Security - Sales Rep under $5M and SE under $25M | | 1. Americas Security - Sales Rep under $5M and SE under $25M - Quota 2 | |
|---|---|---|---|
| Attainment | Rate | Attainment | Rate |
| 0.00 % - 50.00 % | AS_Bookings_COM_Tier_1 | 0.00 % - 50.00 % | AS_Bookings_COM_Tier_1_Quota_2 |
| 50.00 % - 100.00 % | AS_Bookings_COM_Tier_2 | 50.00 % - 100.00 % | AS_Bookings_COM_Tier_2_Quota_2 |
| 100.00 % - 120.00 % | AS_Bookings_COM_Tier_3 | 100.00 % - 120.00 % | AS_Bookings_COM_Tier_3_Quota_2 |
| 120.00 % - 140.00 % | AS_Bookings_COM_Tier_4 | 120.00 % - 140.00 % | AS_Bookings_COM_Tier_4_Quota_2 |
| 140.00 % - 200.00 % | AS_Bookings_COM_Tier_5 | 140.00 % - 200.00 % | AS_Bookings_COM_Tier_5_Quota_2 |
| 200.00 % - 250.00 % | AS_Bookings_COM_Tier_6 | 200.00 % - 250.00 % | AS_Bookings_COM_Tier_6_Quota_2 |
| 250.00 % - 0.00 % | AS_Bookings_COM_Tier_7 | 250.00 % - 0.00 % | AS_Bookings_COM_Tier_7_Quota_2 |

**Draw**

| Draw Period | JAN-2011 | FEB-2011 | MAR-2011 | APR-2011 | MAY-2011 | JUN-2011 | JUL-2011 | AUG-2011 | SEP-2011 | OCT-2011 | NOV-2011 | DEC-2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2011 YTD Payment JAN thru MAY (USD) | 7,995.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Bonuses**

| Name | Description |
|---|---|
| $1M Club Bonus | When a single PO with the same customer number is greater than or equal to $1,000,000 the participant will receive a $5000 bonus. |
| AS Cross Sales Lead Bonus 30PCT | When a booking has a Cross Sales Lead Owner the Booking Rep will receive an additional 30% bonus. |
| AS Cross Sales Lead Bonus 70PCT | When a booking has a Cross Sales Lead Owner the Cross Sales Lead Owner will receive an additional 70% bonus. |
| Adjustment | Manual payment adjustment. |
| Americas Security President's Club 105pct | Notifies the participant when the criteria for President's Club have been met, note each participant is eligible for a single tier. Eligibility and criteria can be found in the Americas Security Plan Document. |
| Americas Security President's Club 110pct | Notifies the participant when the criteria for President's Club have been met, note each participant is eligible for a single tier. Eligibility and criteria can be found in the Americas Security Plan Document. |
| Americas Security President's Club 115pct | Notifies the participant when the criteria for President's Club have been met, note each participant is eligible for a single tier. Eligibility and criteria can be found in the Americas Security Plan Document. |
| Americas Security President's Club 120pct | Notifies the participant when the criteria for President's Club have been met, note each participant is eligible for a single tier. Eligibility and criteria can be found in the Americas Security Plan Document. |
| Americas Security President's Club 125pct | Notifies the participant when the criteria for President's Club have been met, note each participant is eligible for a single tier. Eligibility and criteria can be found in the Americas Security Plan Document. |
| Customer Satisfaction Bonus under 300pct | Participant will receive a Customer Satisfaction Bonus equal to the Customer Satisfaction Score/ Customer Satisfaction Component Weight * Target Incentive. Customer satisfaction score capped at 300% for payout. |
| Prior to 2011 booking | Payment on any booking, positive or negative, with an original order date prior to January 1, 2011. |
| Security New Customer Bonus - Tier 1 | Participant will receive $3,000 for any New Customer booking where the total PO is greater than or equal to $250,000 and less than $1,000,000. |
| Security New Customer Bonus - Tier 2 | Participant will receive $5,000 for any New Customer booking where the total PO is greater than or equal to $1,000,000 and less than $2,000,000. |
| Security New Customer Bonus - Tier 3 | Participant will receive $12,000 for any New Customer booking where the total PO is greater than or equal to $2,000,000 and less than $3,000,000. |
| Security New Customer Bonus - Tier 4 | Participant will receive $18,000 for any New Customer booking where the total PO is greater than or equal to $3,000,000 and less than $4,000,000. |
| Security New Customer Bonus - Tier 5 | Participant will receive $24,000 for any New Customer booking where the total PO is greater than or equal to $4,000,000. |

Participant shall review the specific details of the NICE Incentive Plan applicable to their region by clicking the following link:

Click Here

By clicking "I ACCEPT" below, Participant certifies that he/she has read in its entirety and understands each of (a) this Goal Sheet, and (b) the NICE Incentive Plan, and agrees to be bound by all of the terms and conditions contained therein, including any materials/documents that are incorporated by reference into either of this Goal Sheet or the NICE Incentive Plan."

Should you have any questions regarding this Goal Sheet or the NICE Incentive Plan, please contact your manager at Stacey Katz, Director, Compensation & Benefits.

Eduardo Gordon (59033) (Person)  Accepted 10/12/2011 03:10 PM GMT