**Not for Publication**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **EDUARDO GORDON,**<br><br>　　　　　　　　Plaintiff,<br><br>　　　　v.<br><br>**NICE SYSTEMS, INC.,** *et al.*,<br><br>　　　　　　　　Defendants. | Civil Action No. 18-2168 (ES) (CLW)<br><br>OPINION |

**SALAS, DISTRICT JUDGE**

In this contract dispute, plaintiff Eduardo Gordon seeks unpaid commission from defendants Nice Systems, Inc. and Nice Systems Latin America, Inc. (collectively, "Defendants" or "the company") for consulting work he performed in 2011. (D.E. No. 40 ("Second Amended Complaint" or the "SAC")).[1] Before the Court is Defendants' renewed motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (D.E. No. 75 ("Mov. Br.") & D.E. No. 87). Having considered the parties' submissions, the Court decides this matter without oral argument. *See* Fed R. Civ. P. 78(b); L. Civ. R. 78.1(b). As set forth below, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** Defendants' motion.

---

[1] Before Defendants removed the instant matter to this Court, Plaintiff had filed an amended complaint in state court. (D.E. No. 1). Following removal, Defendants moved to dismiss the amended complaint, which the Court ultimately granted without prejudice. (D.E. Nos. 6, 20 & 39). Plaintiff filed a second amended complaint, although the submission is styled as the "Amended Complaint." (D.E. No. 40). For consistency with the Court's electronic filing system, the Court will refer to Docket Entry number 40 as the "Second Amended Complaint" or the "SAC."

1

I.   **Background**[2]

   A. **Factual Background**

Unless otherwise noted, the following facts are not in dispute. Defendants operate a software solutions company. (Def. SMF ¶ 1; Pl. Resp. SMF ¶ 1). In November 2009, Defendants engaged Plaintiff as a sales representative in Latin America. (Def. SMF ¶ 1; Pl. Resp. SMF ¶ 1). Specifically, Plaintiff entered into a consulting agreement with Defendants on November 16, 2009, which was later superseded by a sales incentive plan agreement effective January 1, 2011, to December 31, 2011. (Def. SMF ¶ 1 & 3; Pl. Resp. SMF ¶ 1 & 3; D.E. No. 76-2, Ex. 2 to Def. SMF ("Plan") ¶ 11.2). Plaintiff was paid pursuant to the Plan and an accompanying goal sheet. (Def. SMF ¶ 3; Pl. Resp. SMF ¶ 3; D.E. No. 76-3, Ex. 3 to Def. SMF ("Goal Sheet")). The Goal Sheet set forth a commission payment schedule to incentivize Plaintiff to sell certain product lines, including NiceVision ("NV"), Public Safety ("PS"), and Situation Management ("SMS"). (Def. SMF ¶ 4; Pl. Resp. SMF ¶ 4).

Pursuant to the Plan, Defendants were to make payments of any commission "45 days after the close of any given month or quarter for Bookings . . . in that period." (Plan ¶ 6.1). As defined by the Plan, a "Booking" is "an Order which complies with the requirements of The NICE Global Bookings Policy and has been approved by the Regional VP, Finance." (*Id.* ¶ 3.4). The Regional VP of Finance has "full discretion to hold back any payment order for further inquiries before it is considered a Booking." (*Id.* ¶ 6.4). The Plan provides that the employee "should refer to their goal sheet to determine payment schedule and frequency." (*Id.* ¶ 6.1). Plaintiff's Goal Sheet provides for monthly payments. (Goal Sheet).

---

[2] The Court gathers the following facts primarily from Defendants' statement of material facts not in dispute (D.E. No. 76 ("Def. SMF")), Plaintiff's responses thereto (D.E. No. 77-20 ("Pl. Resp. SMF")), Plaintiff's supplemental statement of disputed material facts (D.E. No. 77-21 ("Pl. SMF")), and Defendants' responses thereto (D.E. No. 79 ("Def. Resp. SMF")).

According to the Plan, Plaintiff was considered an employee-at-will, and Defendants could "terminate [his] employment . . . at any time, with or without cause." (Plan ¶ 11.3). An employee who either (i) resigned or (ii) was terminated for cause may seek commission based on Bookings received through the last day of employment. (*Id.* ¶ 11.4.1.2). Alternatively, an employee who either (i) internally transferred or (ii) was terminated *without* cause may seek commission owed on Bookings received thirty days from the last day of employment:

> **Termination of Employment and Plan Participation**
>
> . . . .
>
> *For Participants who resign from the Company* or *are terminated for Cause*, Incentive and Bonuses will be calculated based on Bookings received by the Company through the last day of Plan participation. *For Participants who cease to be Participants in the Plan as a result of a transfer to another position in the Company* or *a termination of employment without Cause*, Incentive and Bonuses will be calculated based on Bookings (for the Participant's Territory or accounts as they existed on the Participant's last day of Plan participation) received by the Company through the date which is *thirty days after* the last day of Plan participation.

(*Id.* (emphases added)).

Throughout approximately February and March 2011, Plaintiff asserts that he facilitated a transaction known as the Hercules Project, the transaction for which he seeks additional commission in the instant action. (Def. SMF ¶ 11; Pl. Resp. SMF ¶ 11). On February 8, 2011, Michael Saloman, a finance director with Nice Systems Ltd. Israel, assigned Plaintiff to the Hercules Project as "Sales Manager Latin America." (D.E. No. 77-15, Ex. M to Paris Cert. at 1).[3] Plaintiff testified that he was assigned to the project to "fill[] the gaps in the territory" regarding language and culture, and that he attended meetings and made "arrangements related to financing

---

[3] Unless otherwise noted, pin cites to Exhibit M to Docket Entry number 77-15 and Exhibit 6 to Docket Entry number 76-6 refer to the pagination automatically generated by the Court's electronic filing system.

and consulting." (D.E. No. 76-7, Ex. 7 to Def. SMF ("Gordon Dep.") at 54:11–19 & 55:3–16). On March 14, 2011, Plaintiff received an internal email with the subject line "Hercules Project[] Signed," congratulating him, among others, on a "great job during the process of bringing this deal." (D.E. No. 77-3, Ex. A to Paris Cert.).

The Hercules Project earned approximately $25 million. (Pl. SMF ¶ 17; Def. Resp. SMF ¶ 17). Without citation to the record, Plaintiff claims he was paid approximately $74,000.00 in commission on the Hercules Project but is still owed approximately $863,264.00. (Pl. Resp. SMF ¶ 17).[4]

Plaintiff separated from the company on December 31, 2011. (Def. SMF ¶¶ 9–10; Pl. Resp. SMF ¶ 10; Pl. SMF ¶ 18).[5] Following his separation, Plaintiff was in communication with Defendants regarding alleged unpaid commission on the Hercules Project. (Pl. Resp. SMF ¶ 9). On December 18, 2013, Defendants sent Plaintiff a chart by email indicating that approximately 90% of the Bookings were categorized as "S2," which is not defined in Plaintiff's Plan or Goal Sheet, and the remainder were categorized as NV, PS, and SMS. (D.E. No. 77-16, Ex. N to Paris

---

[4] Plaintiff also asserts that he is owed "an additional unpaid bonus in the amount of approximately $80,000" without further explanation or citation to the record. (Pl. Resp. SMF ¶ 17; *see also* SAC at ¶ 23 ("Plaintiff is owed unpaid bonuses unrelated to the Hercules Project, in the amount of approximately $80,000")). Defendants take the position that the Court eliminated Plaintiff's claim for a "'bonus' payment outside the contract" under its May 11, 2020 Opinion and Order dismissing all claims but breach of contract. (Mov. Br. at 8 n.5). The Court notes that its previous Opinion and Order did not dismiss Plaintiff's claim for any "bonus" he may be entitled to recover as a result of the alleged breach of the Plan. (D.E. No. 49 at 4–7; *see also* D.E. No. 50). Yet without any specific argument from Plaintiff regarding the basis for this claim, the Court declines to weigh in on this claim at this juncture. It is ultimately Plaintiff's obligation to prove the basis for the recovery that he seeks in light of this Opinion.

[5] The reason for Plaintiff's separation is unclear. Defendants vaguely assert that Plaintiff's "affiliation" with Defendants "ended on December 31, 2011," and that "[a]s a result, [P]laintiff was only entitled to receive commission for Bookings through January 30, 2012." (Def. SMF ¶¶ 9–10). As such, Defendants appear to invoke paragraph 11.4.1.2 of the Plan, excerpted above, which provides that as a result of either (i) internal transfer or (ii) termination without cause, Defendants were required to pay any commission owed on Bookings received thirty days from the last day of employment—here, January 30, 2012. *See supra* at 3. Thus, Defendants appear to assert that Plaintiff either internally transferred, which seems to contradict their assertion that his affiliation with the company ended, or was terminated without cause. Plaintiff asserts that he was "terminated without cause effective December 31, 2011." (Pl. Resp. SMF ¶ 10; Pl. SMF ¶ 18). However, in response to that same assertion, Defendants deny "the characterization that [P]laintiff was somehow 'terminated' without cause." (Def. Resp. SMF ¶ 18). Thus, while the parties appear to dispute whether Plaintiff was "terminated," they agree that his last date of employment was December 31, 2011.

4

Cert.). The email does not specifically indicate whether the chart is in reference to the Hercules Project; however, the chart refers to a project worth approximately $20 million dollars. (*Id.*). In a separate email dated February 16, 2014, Saloman informed Plaintiff that, upon "recheck[ing] calculations of the unpaid commission," Defendants would "immediately" transfer $38,160.97 in unpaid commission to Plaintiff, without further explanation or reference to any specific project. (D.E. No. 77-9, Ex. G to Paris Cert.).

Plaintiff asserts that Defendants improperly calculated his commission and "unilaterally manipulated its 'booking' of the Hercules Project to avoid the payment of Plaintiff's commission" on that project, which Defendants deny. (Pl. SMF ¶ 21; Def. Resp. SMF ¶ 21). On the other hand, Defendants assert that the Hercules Project was considered an "S2" project, "represent[ing] the sale of 'Security Solutions.'" (Def. SMF ¶ 11; D.E. No.76-6, Ex. 6 to Def. SMF ("Cody Dec.") ¶ 5). According to Defendants, "[a]s was the case with the Hercules Project, S2 projects may have included sales of the NICE products and services for which [P]laintiff was to receive commissions, (*i.e.*, NV, PS, SMS), but were far more complex and expansive deals that also included various other products and services for which plaintiff was [not] entitled to commission." (Def. SMF ¶ 13). Defendants assert that "[h]ad [P]laintiff been entitled to compensation under an S2 project, his Goal Sheet would have been markedly different." (*Id.* ¶ 14).

However, according to Plaintiff, an S2 project was merely "a type of project" that involves "just a little more than selling products, service, and maintenance." (Gordon Dep. at 103:3–5). For purposes of the categories on the Goal Sheet, Plaintiff testified that "[t]here was no category for S2 [because] S2 includes the same products, services, and maintenance that the normal project has. It was only a matter of getting more revenue[] for the company . . . [and] more commissions for the salesperson." (D.E. No. 77-11, Ex. I to Paris Cert. at 110:6–11). Further, Plaintiff testified

5

that his Goal Sheet did not include a line item for S2 because "there was no special category [for] being paid different[ly] for S2 projects." (*Id.* at 110:15–17). The testimony of Defendants' former general manager, Moti Shabtai, similarly suggests that the S2 designation would not impact the product lines for which Plaintiff was eligible to receive commission:

> Q. And does—whether the project is—or portions of the project is considered product, service, or maintenance have anything to do with whether—with whether the project is within S2?
>
> A. No. Any project in NICE could have one or more of the three components of products, services, and maintenance. It's not specifically for S2.
>
> . . . .
>
> Q. And none of S2 can be considered product, services, or maintenance?
>
> A. No. It's a—it's unrelated to S2. The rule again—was in the region, the rule was that you are getting paid on the portions of the project—of an S2 project—that are either [s]urveillance and/or [p]ublic [s]afety that are booked in the region. That was the rule.

(D.E. No. 77-18, Ex. P to Paris Cert. ("Shabtai Dep.") at 84:6–12 & 87:13–20). Plaintiff asserts that "his commissions should have been calculated as though [NV, PS, and SMS products] were the only components of the Hercules Project." (Pl. Resp. SMF ¶ 11).

### B. Procedural History

Plaintiff filed his initial complaint in state court on December 28, 2017, and filed an amended complaint on January 25, 2018. (D.E. No. 1-1). Defendants removed the case to this Court on February 15, 2018. (D.E. No. 1). On February 22, 2018, Defendants moved to dismiss the amended complaint, which the Court initially denied without prejudice. (D.E. No. 6 & D.E. No. 20). On May 3, 2019, upon supplemental briefing, the Court granted the motion and dismissed the amended complaint without prejudice because Plaintiff had failed to identify the specific

agreement relied upon for his claims. (D.E. No. 39).

On May 29, 2019, Plaintiff filed the Second Amended Complaint, seeking an accounting of all sums due and owing and resulting damages for (i) breach of contract, (ii) breach of the implied covenant of good faith and fair dealing, (iii) conversion, and (iv) unjust enrichment. (SAC ¶¶ 24–46). On June 28, 2019, Defendants filed a motion to dismiss the Second Amended Complaint. (D.E. No. 42). On May 11, 2020, the Court partially granted the motion and dismissed all but Plaintiff's breach of contract claim. (D.E. No. 49 & D.E. No. 50). The Court determined that because the original complaint was filed on December 28, 2017, any cause of action that accrued before December 28, 2011, would be time-barred. (D.E. No. 49 at 6). Nonetheless, the Court allowed Plaintiff's breach of contract claim to proceed despite Defendant's position that the claim was time-barred because, based on the record before the Court, it was not clear when exactly the Hercules Project was "booked." (*Id.*). The Court provided that Defendants were free to raise a statute of limitations argument again at a later stage in the litigation. (*Id.* at 7).

Following the close of discovery, the parties attended a settlement conference on May 25, 2021, which was unsuccessful. (D.E. No. 54; D.E. No. 64; D.E. No. 66). On June 2, 2021, the Court granted Defendants leave to file a motion for summary judgment. (D.E. No. 68). On July 21, 2021, Defendants filed their motion for summary judgment, which was fully briefed. (D.E. No. 74; Mov. Br.; D.E. No. 77 ("Opp."); D.E. No. 78 ("Reply")). As part of their motion, Defendants argued that Plaintiff's claim is barred, at least in part, by the statute of limitations, and submitted a spreadsheet to represent the relevant Booking dates for the Hercules Project. (Mov. Br. at 12–14; Def. SMF ¶ 18; Cody Dec. at 7). According to the spreadsheet, Defendants recorded Bookings in connection with the Hercules Project from June 2011 through May 2013 in the categories of NV, PS, SMS, and S2. (Cody Dec. at 7). Plaintiff denies that the spreadsheet is an

accurate representation of the Bookings because Defendants were "in total control of when it would 'book' a project." (Pl. Resp. SMF ¶ 18 (citing D.E. No. 77-16, Ex. N to Paris Cert.)).

On February 8, 2022, the Court referred this matter to mediation, stayed the action pending mediation, and administratively terminated Defendants' motion for summary judgment. (D.E. No. 84). After mediation was unsuccessful, Defendants reinstated the instant motion for summary judgment. (D.E. Nos. 85–87).

## II.     Legal Standard

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when—in viewing the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmovant—a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the non-moving party's favor. *Id.* A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

At the summary judgment stage, the Court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *Id.* at 249. The movant bears the burden of establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to present evidence that a genuine issue of material fact compels a trial. *Id.* at 324. To meet its burden, the nonmoving party must offer specific facts that establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). The non-moving party may rely on its own affidavits or on the "depositions, answers to

interrogatories, and admissions on file" to designate these facts, but may not rely solely on its own pleadings. *Celotex*, 477 U.S. at 324; *see also Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

### III. Analysis

#### A. Breach of Contract

Under New Jersey law, a plaintiff must establish three elements in support of a breach of contract claim: "(1) a valid contract, (2) breach of that contract, and (3) damages resulting from that breach." *Ramada Worldwide Inc. v. Courtney Hotels USA, LLC*, No. 11-896, 2012 WL 924385, at *3 (D.N.J. Mar. 19, 2012).[6] Defendants argue that they are entitled to summary judgment because Plaintiff cannot establish the element of breach. (Mov. Br. at 9–11). First, Defendants appear to dispute whether Plaintiff was actually involved in the Hercules project. (*Id.* at 9–10). Second, Defendants argue that no reasonable jury could find that Defendants failed to make any payments that are due to Plaintiff because there is nothing in the record to suggest that he was entitled to commission on Hercules Project Bookings designated as S2. (*Id.* at 10–11). In response, Plaintiff argues that summary judgment is improper because the record contains evidence to suggest that (i) Plaintiff was involved in the Hercules Project and (ii) Defendants "unilaterally classified" certain line items on the Hercules Project as S2 in breach of the Plan and accompanying Goal Sheet in order to avoid paying Plaintiff commission. (Opp. at 9 & 12–18). For the reasons set forth below, the Court agrees with Plaintiff.

First, the record contains internal emails assigning Plaintiff to the Hercules Project as "Sales Manager Latin America" and congratulating him on the close of the deal. (D.E. No. 77-15, Ex. M to Paris Cert. at 1; D.E. No. 77-3, Ex. A to Paris Cert.). In addition, Plaintiff testified that

---

[6] The parties agree that New Jersey law governs Plaintiff's breach of contract claim. (Mov. Br. at 10; Opp. at 1 & 8).

9

he was assigned to the project to "fill[] the gaps in the territory" regarding language and culture, and that he attended meetings and made arrangements "related to financing and consulting." (Gordon Dep. at 54:11–19 & 55:3–16). Thus, viewing the record in the light most favorable to Plaintiff, a reasonable jury could find that Plaintiff participated in the Hercules Project.

Second, the record contains conflicting evidence as to the meaning of the S2 designation and what effect such designation had on Plaintiff's commission under the Plan and accompanying Goal Sheet. According to Defendants, "S2 projects may have included sales of the NICE products and services for which Plaintiff was to receive commissions," namely, NV, PS, SMS, but also included various other products and services for which Plaintiff was not entitled to receive commission. (Def. SMF ¶ 13). However, Plaintiff testified that "[t]here was no category for S2 [because] S2 includes the same products, services, and maintenance that the normal project has." (D.E. No. 77-11, Ex. I to Paris Dec. at 110:6–11). In addition, the testimony of Defendants' former general manager suggests that the S2 designation would not impact the product lines for which Plaintiff was eligible to receive commission. (Shabtai Dep. at 84:6–12 ("Any project in NICE could have one or more of the three components of products, services, and maintenance. It's not specifically for S2.")). Thus, viewing the record in the light most favorable to Plaintiff, a reasonable jury could find that Defendants classified certain line items on the Hercules Project Bookings as S2 in order to avoid paying Plaintiff commission. Such a credibility determination is appropriate for a jury and inappropriate on a motion for summary judgment. *See Anderson*, 477 U.S. at 255

Accordingly, the Court finds that there are genuine issues of material fact as to whether Defendants breached the Plan and accompanying Goal Sheet that preclude summary judgment.

### B. Statute of Limitations

Defendants alternatively argue that Plaintiff's claim is barred, at least in part, by the statute of limitations. (Mov. Br. at 13). Under New Jersey law, a claim for breach of contract is subject to a six-year statute of limitations. N.J.S.A. 2A:14-1. As such, the Undersigned previously ruled that because the original complaint was filed on December 28, 2017, any cause of action that accrued before December 28, 2011, is time-barred. (D.E. No. 49 at 6; *see also* Mov. Br. at 12; Pl. Resp. SMF ¶ 26; Opp. at 21). The parties agree that a cause of action accrues when an enforceable right comes into existence. *See Metromedia Co. v. Hartz Mountain Assocs.*, 655 A.2d 1379, 1381 (N.J. 1995). (Mov. Br. at 13; Opp. at 19). The parties disagree, however, on the relevant accrual date of Plaintiff's claims.

Defendants submit that Bookings were recorded in connection with the Hercules Project from June 2011 through May 2013 in the categories of NV, PS, SMS, and S2. (Cody Dec. at 7). Defendants argue that Plaintiff "can only pursue a claim that accrued based on 'Bookings' *after* November 1, 2011" because Defendants were required to pay Plaintiff commission on Bookings received during any given month within 45 days after the close that month. (Mov. Br. at 13 (citing Plan ¶ 6.1)). Thus, any commission earned *prior* to November 1, 2011, would have been due, at the latest, within 45 days of the close of October (which was before December 28, 2011) and any claim for such commission is therefore barred by the applicable statute of limitations. (*Id.*). For the reasons explained below, the Court agrees.

Pursuant to the Plan, Defendants were to make payments of any commission "45 days after the close of any given month . . . for Bookings . . . in that period." (Plan ¶ 6.1). For example, commission on any October 2011 Bookings became due to Plaintiff 45 days after the close of October, or on December 16, 2011. As such, Plaintiff's claim on any outstanding commission on

11

October 2011 Bookings accrued on December 17, 2011, and was actionable for six years, or until December 17, 2017, *before* this action was commenced on December 28, 2017.  Therefore, a claim for commission on any October 2011 or earlier Booking is time-barred.  On the other hand, commission on any November 2011 Booking became due to Plaintiff 45 days after the close of November, or on January 15, 2012.  As such, Plaintiff's claim on any outstanding commission for Bookings as of November 1, 2011, accrued on January 16, 2012, and was actionable for six years, or until January 16, 2018, *after* this action was commenced on December 28, 2017.  Therefore, to the extent that Plaintiff seeks commission for Bookings received prior to November 2011, such a claim is time-barred.

Plaintiff appears to argue that his cause of action is not time-barred in any way. (Opp. at 20–21).  Specifically, Plaintiff argues that his claim, presumably for any outstanding commission regardless of the Booking date, accrued on January 30, 2012, or thirty days after his separation from the company.[7]  (*Id.*).  The Court disagrees.  As discussed above, paragraph 6.1 of the Plan provides the accrual date for potential claims: 45 days after the close of the month for a given Booking.  (Plan ¶ 6.1).  Plaintiff appears to invoke paragraph 11.4.1.2 of the Plan as a basis for claim accrual on January 30, 2012.  However, as addressed more fully below in Section III.C., Paragraph 11.4.1.2 speaks to the limit for potential recovery, providing the latest Booking for which Plaintiff is entitled to commission.  In relevant part, paragraph 11.4.1.2 provides that following either (i) internal transfer or (ii) termination without cause, Plaintiff may seek commission on Bookings received by Defendants "thirty days after the last day" of employment, here, January 30, 2012.  (Plan ¶ 11.4.1.2).  Thus, this provision allows Plaintiff to *potentially*

---

[7]   Plaintiff first refers to January 31, 2012, and then refers to January 30, 2012. (Opp. at 20–21).  Because thirty days from his December 31, 2011 separation was January 30, 2012, the Court refers to the latter date.

recover for commission on Bookings received through January 30, 2012. In other words, paragraph 11.4.1.2 is forward-looking, setting to latest parameter for a valid claim under the Plan, while paragraph 6.1 is backward-looking, setting the earliest parameter for a timely claim under the statute of limitations by providing the earliest date for accrual of actionable claims: January 16, 2012, which relates to November 2011 Bookings. Therefore, a plain reading of the Plan does not provide a basis for a general accrual date for all potential claims on January 30, 2012. *See M.J. Paquet, Inc. v. New Jersey Dep't of Transp.*, 794 A.2d 141, 152 (N.J. 2002) (contract terms must be given their plain and ordinary meaning).[8]

---

[8] Plaintiff alternatively argues that his cause of action did not accrue until February 16, 2014, relying on the February 16, 2014 email by which "Defendant paid Plaintiff an additional commission based upon an admitted mistake by Defendant in the Hercules project bookings." (Opp. at 21 (citing D.E. No. 77-9, Ex. G to Paris Cert.)). The Court disagrees. As described in Section I, *supra*, Plaintiff was informed by Saloman's February 16, 2014 email that, upon "recheck[ing] calculations of the unpaid commission," Defendants would "immediately" transfer $38,160.97 in unpaid commission to Plaintiff, without specifying as to any particular project. (D.E. No. 77-9, Ex. G to Paris Cert.). The email provided that Saloman "found no error in the process conducted so far, including the data used for the calculations, and . . . verified the calculated amount." (*Id.*). In any event, the basis for Plaintiff's argument that his cause of action could not have accrued until February 16, 2014, is unclear, especially considering Plaintiff's own assertion that his claim became actionable "as early as January 30, 2012," more than two years earlier. (Opp. at 22). As discussed above, the earliest actionable claim for unpaid commission accrued on January 16, 2012.

Moreover, Plaintiff appears to rely on *R.C. Beeson, Inc. v. Coca Cola Co.*, 337 Fed. Appx. 241, 244 (3d Cir. 2009) in further support of his position that his cause of action did not accrue until either January 30, 2012, or February 16, 2014. (*See* Opp. at 21–22). Although Plaintiff's argument is unclear, he appears to suggest that, pursuant to *Beeson*, he can lengthen the *forward-looking* parameter of the time-period during which he is entitled to commission beyond that set forth in paragraph 11.4.1.2 of the Plan to either January 30, 2012, or February 16, 2014, because he wasn't "actually damaged by the breach" until those dates. (*See* Opp. at 22). Such reliance is misplaced. *Beeson* analyzed an installment contract, where "a new cause of action arises on the date on which each payment is missed." 337 Fed. App'x. at 244. There, the Third Circuit noted that "an act of repudiation triggers a plaintiff's ability to sue for a breach as to the missed payment." *Id.* "Repudiation 'entails a statement or "voluntary affirmative act" indicating that the promisor "will commit a breach" when performance becomes due.'" *Id.* (quoting *Franconia Assocs. v. United States,* 536 U.S. 129, 143 (2002)). First, to the extent that Plaintiff means to argue that Defendants' conduct constitutes repudiation, the Court is not convinced. Without citation to the record, Plaintiff only points to Defendants' "continued communication with Plaintiff, over the course of more than two years, regarding unpaid commissions." (Opp. at 22). It is unclear that such conduct rises to the level of deliberate repudiation of Defendants' contractual obligations. *See Beeson*, 337 Fed. Appx. at 244 ("[a] single infraction of contractual obligations, such as a missed payment, is insufficient"). Second, even assuming that Defendants' conduct constituted repudiation, the Third Circuit in *Beeson* did not set forth a mechanism to resurrect claims that have already contractually expired, but rather set forth that the requisite repudiation may trigger the statute of limitations "immediately" upon the breach. *Id.* at 245 ("While the subsequent underpayments put [the plaintiff] on notice of the breach . . . they did not give [the plaintiff] the opportunity to delay action on its claim."). Even if it could be said that Defendants did not breach until either January 30, 2012, or February 16, 2014, it remains that a claim for commission on any October 2011 Bookings accrued on December 17, 2011, and is thus time-barred, and a claim for commission on any November 2011 Bookings or later accrued on January 16, 2012, at the earliest and is thus timely. As such, *Beeson* is inapposite.

13

### C. Potential Recovery

Finally, Defendants argue that the extent of Plaintiff's potential recovery should be limited pursuant to paragraph 11.4.1.2 of the Plan. (Mov. Br. at 14). Specifically, Defendants argue Plaintiff's claim should be limited to commission on Bookings received through January 30, 2012, thirty days from his December 31, 2011 separation from the company. (*Id.* (citing Plan at ¶ 11.4.1.2)). Plaintiff does not respond to this argument. For purposes of streamlining Plaintiff's claims for trial and for the reasons explained below, the Court agrees with Defendants.

"Generally, the terms of an agreement are to be given their plain and ordinary meaning." *Paquet*, 794 A.2d at 152. If the language of the contract is clear, the Court must enforce it as written. *CSFB 2001-CP-4 Princeton Park Corp. Ctr., LLC v. SB Rental I, LLC*, 980 A.2d 1, 4 (N.J. Super. Ct. App. Div. 2009). In interpreting a contract, the Court "may consider all of the relevant evidence that will assist in determining its intent and meaning." *Fed Cetera, LLC v. Nat'l Credit Servs., Inc.*, 938 F.3d 466, 469–70 (3d Cir. 2019) (quoting *Manahawkin Convalescent v. O'Neill*, 85 A.3d 947, 958–59 (N.J. 2014)).

As outlined in Section I, *supra*, paragraph 11.4.1.2 provided two possibilities for the extent of potential recovery of unpaid commission. (Plan ¶ 11.4.1.2). First, an employee who either (i) resigned or (ii) was terminated for cause was entitled to commission on Bookings received "through the last day" of employment. (*Id.*). Second, an employee who either (i) internally transferred or (ii) was terminated without cause was entitled to commission on Bookings received "thirty days after the last day" of employment. (*Id.*). Thus, the extent of potential recovery of unpaid commission—either for Bookings received through the last day of employment, December 31, 2011, or for Bookings received through thirty days *after* the last day of employment, January 30, 2012—depends on the circumstances surrounding Plaintiff's separation from the company.

14

Here, the circumstances surrounding Plaintiff's separation are unclear based on the current record. To argue that Plaintiff would only be entitled to commission on Bookings received through January 30, 2012, Defendants cite to paragraph 11.4.1.2 of the Plan, which, as noted above, allows for recovery of commission on Bookings received thirty days after either (i) internal transfer or (ii) termination without cause. (Mov. Br. at 14). Defendants then conclude that if Plaintiff establishes breach, he would be entitled to commissions for Bookings received "through January 30, 2012, as his relationship with NICE ended on December 31, 2011." (*See id.*). And, as previously noted, Defendants dispute that Plaintiff was "terminated." (Def. Resp. SMF ¶ 18; Reply at 5 n.6 ("there was no 'termination of employment'")). Thus, Defendants' position on the circumstances surrounding Plaintiff's separation from the company appears contradictory because paragraph 11.4.1.2 triggers Plaintiff's entitlement to commission on Bookings received through January 30, 2012, if he either remained with the company and internally transferred, or if he was terminated without cause, both of which they dispute. Plaintiff does not respond to this argument in his opposition brief. Nevertheless, he asserts in his responsive and supplemental statements of facts that he was "terminated without cause" (Pl. Resp. SMF ¶ 10; Pl. SMF ¶ 18), which would *also* trigger the provision of paragraph 11.4.1.2 that limits his entitlement to commission to that on Bookings received through thirty days after his December 31, 2011 separation from the company, or January 30, 2012. Therefore, Plaintiff appears to effectively concede, or at least waive opposition, to Defendants' position that his potential recovery is limited to commission on Bookings received through January 30, 2012. Based on a plain reading of the contract terms, the Court agrees that Plaintiff may seek, *at most*, commission on Bookings received through January 30, 2012, pursuant to paragraph 11.4.1.2 of the Plan. Accordingly, Plaintiff's claim is limited to commission on Bookings received through January 30, 2012.

15

**IV.     Conclusion**

Based on the foregoing, Defendants' motion for summary judgment is **GRANTED-IN-PART** and **DENIED-IN-PART**. For purposes of streamlining Plaintiff's claims for trial, his claims are limited to those for commission on Bookings received by Defendants between November 1, 2011, and January 30, 2012. Summary judgment is otherwise **DENIED**.

An appropriate Order accompanies this Opinion.

Dated: December 23, 2022

                                                      s/ *Esther Salas*
                                                      **Esther Salas, U.S.D.J.**